## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| ANDES CAPITAL FINANCING LLC and COEVOLUTION LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. _____ |
| v. | ) ) | |
| CROSSED KEYS LLC, BRIAN WEAVER, JAE CHA, and TORCH RESEARCH LLC, | ) ) ) | |
| Defendants. | ) ) | |

### COMPLAINT

Andes Capital Financing LLC ("Andes") and Coevolution LLC ("Coevolution") (collectively, "Plaintiffs") sue Defendants Crossed Keys ("Crossed Keys"), Brian Weaver ("Weaver"), Jae Cha ("Cha") and Torch Research LLC ("Torch") (collectively, "Defendants"). In support, Plaintiffs allege:

### PARTIES

1.      Plaintiff Andes is a Texas limited liability company with its principal place of business in Dallas County, Texas. Its members, Andres Ruzo and Aldo Figueroa, reside in Texas. Andes owned an 8.67% membership interest in defendant Torch Research LLC ("Torch").

2.      Plaintiff Coevolution is a Texas limited liability company with its principal place of business in Dallas County, Texas. Its sole member, Carlos Carpizo, resides in Texas. Coevolution owned a 1.33% membership interest in Defendant Torch.

3.      Defendant Crossed Keys is a Kansas limited liability company with its principal place of business in Leawood, Kansas. On information and belief, Crossed Keys owns a 90% membership interest in Defendant Torch, and Crossed Keys' members are all Kansas residents.

4.      Defendant Weaver is the owner and manager of Defendant Crossed Keys, as well

as a manager, board member, and chief executive officer of Defendant Torch.  Defendant Weaver resides in Kansas.

 5. On information and belief, Defendant Cha is an owner and member of Defendant Crossed Keys.  Defendant Cha resides in Kansas.

 6. Defendant Torch is a Delaware limited liability company with its principal place of business in Leawood, Kansas. On information and belief, Torch's members are Crossed Keys and Westcap Group.  On information and belief, Westcap Group is a Delaware LLC whose members are all California residents.

**JURISDICTION AND VENUE**

 7. This Court has subject-matter jurisdiction under 28 U.S.C § 1332 because the parties are diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs. It has personal jurisdiction over Defendants because each Defendant and its members reside Kansas.

 8. Venue is proper in this Court under 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district and Defendants are subject to personal jurisdiction in this district.

### Facts Applicable to All Claims

9.      This is a shareholder dispute over a void squeeze-out merger.  Defendant Crossed Keys is the 90% majority owner of Torch; Plaintiffs (known generally as Link America Group) own the remaining 10% of Torch.[1]

10.     At all times relevant to this lawsuit, Defendant Weaver has held himself out as the majority owner and agent in charge of Defendant Crossed Keys.  As a result, Defendant Weaver essentially believes that he can "call the shots" with regard to when, what, and how things occur with Torch.  *See* Ex. A (Ruzo Declaration).  Plaintiffs disagree.

11.     Today, Torch is a leading global artificial intelligence (AI) firm that uses machine learning to enable massively scaled, ultra-high performance data processing.  Torch recently announced raising $30 million in a Series A funding, led by WestCap Group, a prominent San Francisco-based investment firm.  Torch recently secured $27 million in tax incentives from the State of Kansas, and plans to hire 100 additional employees with an average salary of more than $100,000 in 2021, and to hire more than 500 additional employees in the next five years.  Torch counts among its clients, "blue chip" companies such as Microsoft, H&R Block, and General Electric.  Torch is moving strongly into the government sector, where its technology has been deployed across over more than a dozen U.S. federal agencies.

12.     In 2017, however, Brian Weaver needed crucial capital to keep the business alive.  As a result, Defendants reached out to Plaintiffs to secure the crucial capital/investment to start the entity that is now the highly profitable Torch.  *See* Ex. A at ¶ 5.

13.     Plaintiffs agreed to provide the capital that Weaver sought and in exchange, on or

---

[1] On or around October 9, 2020 (after original Plaintiff filed its original petition in state court, Defendants purportedly conducted what is commonly referred to as a cash-out/squeeze-out merger purportedly transferring Plaintiffs' minority interests in Torch to Defendant Crossed Keys.

around March 3, 2017, the parties executed the Operating Agreement of Torch Research LLC (the "Operating Agreement").  A true and correct copy of the Operating Agreement is attached hereto as Exhibit A-3 and is hereby incorporated by reference as if fully set forth herein.

14.     Under the Operating Agreement, Plaintiffs collectively own a 10% membership interest in Torch. Defendant Crossed Keys owns 90% of Torch's membership interest.  *Id*.

15.     Defendant Weaver was appointed to Torch's Board of Managers and was designated as the "Tax Matters Representative."  *See* Ex. A-3.  Defendant Weaver also holds himself out as the Chief Executive Officer of Torch.  Andres Ruzo was appointed as Link Group's representative, and Chairman of the Board of Managers.  *See id*.

16.     The crux of the current dispute arises from multiple recently conducted business valuations of Torch.  Based on Defendants' various representations (or misrepresentations), Torch has been valued between $10 million to over $130 million.

17.     Indeed, without Plaintiffs' knowledge or consent, Defendant Weaver began "shopping" for purchasers of Torch.  To that end, in or around June of 2019, Defendants engaged one of the "Big Four" accounting organizations—Deloitte Touche Tohmatsu Limited ("Deloitte")—to provide various services related to Defendants' attempts to market Torch.

18.     As part of that engagement, Deloitte provided a report that valued Torch at over $130 million.  The report went on to inform Defendants that Deloitte "estimates that [Torch's] shareholders could realize pre-tax proceeds of approximately $110.4 million while retaining a 20% ownership stake in the Company."[2]

19.     Not surprisingly, after receiving the huge valuation estimates, Defendants began their concerted efforts to oust Plaintiffs for a fraction of what Plaintiffs' 10% membership interest

---

[2]  Out of an abundance of caution, based on Defendants' claim that the Deloitte document is "highly confidential," Plaintiffs have not attached a copy of the document to this Complaint.

in Torch was and is actually worth.  Importantly, before the Deloitte estimate, Defendant Weaver made several attempts to rid Defendants of the minority shareholders since Torch's Operating Agreement provided Plaintiffs with very clear and unambiguous contractual rights (including prohibitions on transfers and approval of major transactions).  Indeed, prior to the Deloitte estimate, Defendant Weaver had made several requests to "buy out" Plaintiffs for between $1,000,000 and $1,500,000.

20.    Defendant Weaver also wanted full control of Torch so that he could engage in wasting corporate assets by, for example, purchasing a private jet.  In Weaver's opinion, Torch was finally doing well financially, and Weaver needed to purchase a private jet in order to become "more efficient" and "more productive."  To do so, however, Weaver needed the approval of the very entities that provided lifesaving funds back when Defendants could barely afford the cost of a commercial flight—much less a private jet.  After Plaintiffs refused to agree, the Parties' relationship soured.

21.    In addition to Defendants' buy-out offers, Defendant Weaver also requested that Plaintiffs agree to amend Torch's Operating Agreement to remove the "unanimous consent" provisions governing membership transfers and major transactions.  Understandably, Plaintiffs did not agree to Defendant Weaver's requests, and Plaintiffs remained committed to Torch and to their investment.

22.    Ultimately, in what can only be interpreted as an attempt to "low ball" Plaintiffs, Defendants engaged other business valuation companies that, not surprisingly, valued Torch at less than $10 million.  After Defendants' continued attempts to have Plaintiffs agree to a ridiculously low buy out amount failed, Defendants proceeded to engage in blatant breaches of contract and violations of fiduciary duties to Plaintiffs as well as to Torch.  Defendants' actions

ultimately resulted in what is commonly known as a "squeeze out" or "cash out" merger, which was in direct violation of Torch's Operating Agreement and Delaware law.

23.     The claims asserted below center on Defendants' refusal to comply with the valid and enforceable Operating Agreement and Defendants' attempt to rob Plaintiffs of their membership interest in Torch.

24.     Once Torch became highly valuable—which is a far cry from when Defendants needed Plaintiffs' help—Defendants began refusing to provide even the most basic of business information.  Among other things, Defendants refused to provide information about distributions, tax information, and outstanding purchase offers.  Indeed, after months of Plaintiffs' attempts to obtain business information from Defendants, Plaintiffs were forced to retain counsel to obtain the information to which they were/are rightfully entitled.

25.     To that end, on or around July 20, 2020, Plaintiffs' counsel sent a comprehensive demand for access to books and records under both Texas and Delaware law.  A true and correct copy of the July 29, 2020 demand is attached hereto as Exhibit A-1 and is hereby incorporated by reference as if fully set forth herein.

26.     Rather than complying with Plaintiffs' reasonable (and legal) request, Defendants made matters worse by deciding to "dig in" and illegally attempt to oust Plaintiffs from the very entity that would not have been possible without Plaintiffs' investment.

27.     To protect Plaintiffs' interest in Torch, on August 24, 2020, Plaintiffs informed Defendants that, pursuant to Torch's Operating Agreement, Andres Ruzo was appointed as the Chairman of the Board of Managers, and as such, Ruzo would chair any properly called membership meeting.  A true and correct copy of the August 24, 2020 correspondence is attached hereto as Exhibit A-4 and is hereby incorporated by reference as if fully set forth herein.

28.     Despite Plaintiffs' multiple efforts to enforce their rights and to preserve their membership interests, Defendants steadfastly moved ahead with their intent to oust Plaintiffs from Torch.  Defendants refused to recognize Ruzo as the Chairman of the Board of Managers and continued moving forward with their proposed merger.

29.     In fact, after Plaintiffs were forced to retain counsel to obtain very basic business information, Defendants unilaterally—and in violation of the Operating Agreement—sent Plaintiffs a defective "Notice of Meeting," pursuant to which Defendant purported to "discuss and approve a proposed merger of Torch Research LLC . . . with and into Crossed Keys LLC . . . pursuant to which [Plaintiffs'] Membership Interests will be cancelled . . . ."  A true and correct copy of the September 15, 2020 Notice of Meeting is attached hereto as Exhibit A-2 and is hereby incorporated by reference as if fully set forth herein.

30.     Pursuant to that "Notice," Defendants—in total violation of the Operating Agreement—intended to unilaterally and illegally dispose of Plaintiffs' ownership interest in Torch by approving a "merger" of Torch and Defendant Crossed Keys. *See* Ex. A-2.  Pursuant to the Notice, Defendant Weaver intended to move forward with the purported membership meeting on September 29, 2020.

31.     Importantly, however, Torch's Operating Agreement has clear and fully-enforceable prohibitions on the transfer or assignment of any members' membership interests without the unanimous written consent of *all* members.  Knowing that the Operating Agreement does not allow for a transfer or assignment of membership interests, Defendants were attempting to make an "end run" around the Operating Agreement's transfer restrictions by simply calling the transfer a "merger."  Defendants' semantics notwithstanding, the Operating Agreement specifically provides, in relevant part, as follows:

**5.4:** **Transfer of Share Interests**. . . . Share Interests of a Member in the Company may not be Transferred or assigned in any manner voluntarily or involuntarily without the unanimous written consent of the other Members of the Company then entitled to be treated as Members and to vote hereunder.

**5.5** **Transfer of Member's Rights Without Consent.** Except as otherwise provided herein, any attempt to transfer, assign, pledge, or encumber in any manner all or any part of a Member's Share Interests in the Company without such prior consent of the other Members shall be void and of no effect . . .

**5.6** **Consequences of Wrongful Transfer or Withdrawal.** If a Member shall Transfer or attempt to Transfer a Share Interest or shall resign or withdraw from the Company or shall be deemed by law to have Transferred his Share Interest or to have resigned or withdrawn from the Company in violation of this Agreement:

> (a) such Member shall thereupon cease to be a Member of the Company and any Share Interest which was not so Transferred shall thereupon be converted into a Transferee's Share Interest (and thereafter such former Member shall have no right or interest in the Company except such right or interest as a Transferee would have with respect to such Share Interest); and

> (b) such Member shall be liable to the Company and the other Members and Transferees for damages caused by such wrongful Transfer, resignation, or withdrawal.

*See* Ex. A-3 (Operating Agreement).

32.    Finally, the Operating Agreement defines a "transfer" as follows, which clearly includes any type of attempted "merger":

> **"Transfer"** and **"Transferred"** mean both the passage and the act of effecting the passage of a legal or equitable interest in a Member's Membership Interest pursuant to a sale, exchange, gift, assignment, pledge, grant of a security interest, foreclosure, garnishment, or other conveyance, disposition, or encumbrance and include without limitation the passage of any such interest by judicial order, bequest, intestate, succession, or other operation of law.

*See* Ex. A-3 (Operating Agreement).

33.    As a result, on or around September 21, 2020, Plaintiffs sought and obtained a Temporary Restraining Order ("TRO") from the 101st Judicial District Court in Texas. The TRO prevented Defendants Weaver and Crossed Keys from, among other things: (1) "directly or indirectly taking any actions that would result in any type of transfer of any membership interest

of Torch Research LLC or any of its members."  A true and correct copy of the TRO is attached

hereto as Exhibit A-5 and is hereby incorporated by reference as if fully set forth herein.

34.     Plaintiffs served Defendants with a courtesy copy of the TRO and again informed

Defendants that Plaintiffs objected to any disposition of their membership interest—whether by a

"merger" or otherwise.  Despite Plaintiffs' repeated objections (including obtaining a TRO),

Defendants remained steadfast in their effort to oust Plaintiffs from Torch.

35.     To that end, on or around September 28, 2020 Defendants sent a "Notice of Meeting

in Connection with Proposed Merger," which purported to inform Plaintiffs that a special meeting

would be held on October 9, 2020.  A true and correct copy of the September 28, 2020 Notice of

Meeting is attached hereto as Exhibit A-6 and is hereby incorporated by reference as if fully set

forth herein.   The September 29, 2020 Meeting Notice stated, in relevant part, as follows:

> This letter, delivered to you at the direction of Crossed Keys, LLC ("Crossed
> Keys"), shall constitute notice to you that, in accordance with Section 4.10 of the
> Operating Agreement, Crossed Keys has called a meeting of Members (the
> "Meeting"), the purpose of which shall be to discuss and approve a proposed
> merger of Torch Research, LLC (the "Company") with and into Crossed Keys (the
> "Merger"). As currently proposed, in connection with the Merger (x) all of the
> Common Membership Interests will be cancelled and, as consideration therefor, the
> holders of such Common Membership Interests immediately prior to the Merger
> will be entitled to receive a specified amount of common equity interests in Crossed
> Keys, which amount shall be disclosed prior to the Meeting and (y) all of the Series
> A Membership Interests will be cancelled and, as consideration therefor, the holders
> of such Series A Membership Interests immediately prior to the Merger will be
> entitled to receive a specified amount of cash, which amount shall be disclosed prior
> to the Meeting.

36.     Tellingly, the Meeting Notice unabashedly stated that Defendants planned to

"merge" Torch *with Torch's own 90% majority member* (Crossed Keys)—which, not surprisingly,

is owned by Defendants Weaver and Cha.  The Meeting Notice went on to state that, in the process,

the Plaintiffs' membership interest would simply be "cancelled."  Just as tellingly, the Meeting

Notice flagrantly stated that Plaintiffs (*i.e.*, the holders of Series A Membership Interests) would

not receive any information or a "specified amount of cash" until immediately prior to the meeting. *See id.*

37.    Importantly, Defendants' Notice was defective because Defendants failed to comply with section 4.10 of Torch's Operating Agreement, which requires that meeting notices be provided in person or by mail.  Considering that the Parties were already in litigation (and a TRO had been previously obtained), Defendants knew or should have known that strict compliance with the Operating Agreement was absolutely necessary.

38.    Nonetheless, over Plaintiffs' vehement objections, Defendants proceeded to conduct a meeting on October 9, 2020 (in which Plaintiffs refused to participate based on, among other things, the defective notice).  Rather than provide Plaintiffs with any type of information whatsoever in advance, Defendants waited until minutes before the October 9, 2020 meeting to provide (via email) even the slightest clue as to what Defendants unilaterally decided to "pay" Plaintiffs for their "cancelled" membership interest.

39.    Defendants conducted the special board meeting at 9:00 a.m. on October 9, 2020. The meeting minutes reflect that Defendant Weaver presided over the special meeting, during which the 90% member (Crossed Keys) purportedly approved a self-interested merger between itself and Torch.  Having (in their minds) accomplished their "squeeze-out"/"cash-out" merger, Defendants proceeded to file the merger documents with the Delaware Secretary of State less than three hours later, at 11:30 a.m. on that same day of October 9, 2020.

40.    Despite Defendants' previous position that Torch was worth multiple millions of dollars (based on the Deloitte opinion), Defendants suspiciously and unilaterally concluded that Plaintiffs' 10% membership interest was worth a fraction of its actual value.  Rather than pay Plaintiffs the fair value of their membership interest in Torch (which Weaver previously

represented was worth more than $130 million), Defendants unilaterally decided that Plaintiffs' 10% membership interest was worth a total of $1,354,248.

41.     Defendants' unilateral and arbitrary "valuation" robbed Plaintiffs of more than $10,000,000.00. And to add insult to injury, Defendants did not even attempt to pay Plaintiffs for Plaintiffs' grossly undervalued membership interests. Rather, Defendants flauntingly decided that they would pay the purchase price at a later time. Indeed, in what amounts to "putting icing on their stolen cake," Defendants executed two separate promissory notes (one for each Plaintiff) providing that Defendants did not have to pay the purchase price until October 9, 2021—*one full year* after the date of the squeeze-out merger. True and correct copies of the Promissory Notes are attached hereto as Exhibit A-7 which is hereby incorporated by reference as if fully set forth herein.

42.     Importantly, Defendants engaged in the wrongful squeeze-out merger without appointing any type of independent board or committee to ensure fairness to the minority members. Defendants planned the squeeze-out merger for months, yet there were absolutely no disinterested or independent majority members to ensure fairness in this self-interested "controller" transaction.

43.     Moreover, Defendants Weaver and Crossed Keys—with Cha's knowledge and consent—engaged in a self-interested, self-dealing, and grossly unfair transaction where Defendant Weaver was a Manager, Director, and Majority Member on both sides of the "merger" transaction. Not only was the transaction not "entirely fair" as required by Delaware law, the squeeze-out merger was entirely *unfair*, fraudulent, and conducted solely for Defendants' benefit at the expense of the minority members (Plaintiffs) to which Defendants owed clear fiduciary duties. Defendants had the ability to use the levers of corporate control to benefit themselves, and Defendants took full advantage of that opportunity.

44.     The bottom line is that Defendants have engaged in egregiously tortious contractual

and extracontractual conduct aimed at stealing away Plaintiffs' investment, along with the benefit of Plaintiffs' multimillion-dollar membership interest in Torch.  As a result of Defendants' conduct, Plaintiffs hereby seek the Court's assistance in adjudicating the causes of action below.

## CAUSES OF ACTION
### (DIRECT CLAIMS)

### COUNT 1:
### BREACH OF CONTRACT

45.      Plaintiffs repeat and incorporate by reference the preceding paragraphs as if set forth fully herein.

46.      As described above, a valid and enforceable contract exists by and between the Parties.  Plaintiffs are a party to a valid and enforceable Operating Agreement that was executed in exchange for Plaintiffs' investment in Torch.  By the conduct described above, Defendants breached their contract with Plaintiffs by failing to abide by their contractual obligations and by entering an ultra vires merger agreement.

47.      Under Section 7.2 of the Operating Agreement, a self-interested-member transaction is only permissible in three circumstances: (1) when the disinterested members approve of the transaction; (2) when 95% of Torch's ownership approves of the transaction; or (3) when the transaction is fair to the company.

48.      When Defendants engaged in the self-interested merger: (1) the disinterested members did not approve of the transaction; (2) less than 95% of Torch's ownership approved of the transaction; and (3) the transaction was *not* fair to the company. The merger transaction is thus void.

49.      Under Section 16.11 of the Operating Agreement, the parties agreed it would be "impossible to measure in money the damages which will be suffered by a person having rights

hereunder by reason of a failure of another to perform any obligation . . ." The parties thus recognized that no adequate remedy at law exists, and Defendants agreed *not* to "assert the claim or defense that any such remedy at law exists."

50.     In approving the merger transaction, Defendants failed to perform their obligation *not* to approve a "transfer" without satisfying Section 7.2's requirements. Plaintiffs thus have no adequate remedy at law.

51.     As a result of Defendants' ultra vires acts in reaching the merger agreement, and because Plaintiffs lack an adequate remedy at law, Plaintiffs are entitled to have the merger agreement rescinded and their 10% ownership of Torch restored.

52.     In the alternative, as a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer direct damages in an amount to be proven at trial.   Plaintiffs, therefore, seek and are entitled to a judgment against the Defendants for all damages caused by Defendants' wrongful conduct.

## COUNT 2:
### BREACH OF FIDUCIARY DUTY

53.     Plaintiffs repeat and incorporate by reference the preceding paragraphs as if set forth fully herein.

54.     Crossed Keys is/was the controlling member of Torch, and Weaver was an officer and director of Torch and Crossed Keys.  As controlling majority members, Defendants owed clear and undeniable fiduciary duties to Plaintiffs as minority members, including the duties of loyalty and care, as well as the contractual duty of good faith and fair dealing.

55.     Those duties necessarily involve the full disclosure of all financials, tax returns, business-related transactions, offers to purchase, business valuations, and proposed mergers.

Defendants, collectively, are a group of persons/entities who are/were entitled to manage and direct the affairs of Torch.  In these capacities, Defendants actually managed and directed the affairs of Torch—including the decision to engage in the "squeeze-out" merger discussed above.

56.     Despite Defendants' clear and unequivocal fiduciary duties to Plaintiffs, Defendants purposely withheld vital information from Plaintiffs, including such basic information as Torch's distributions, Torch's tax information, and Defendants' efforts to market Torch's sale (including the "business valuations" associated therewith).  Defendants willfully, intentionally, recklessly, and in bad faith misrepresented and concealed crucial information from Plaintiffs to benefit Defendants at Plaintiffs' detriment and expense.

57.     Defendants further oppressed Plaintiffs when they engaged in an improper and illegal squeeze-out merger.  Defendants engaged in burdensome, harsh, and wrongful conduct toward Plaintiffs, and Defendants dealt unfairly in the affairs Torch to the prejudice of and detriment to Plaintiffs.  Defendants' actions showed a clear a lack of probity and fair dealing in the companies' affairs to the prejudice Plaintiffs (to Defendants' benefit), which was a visible departure from the standards of fair dealing and a violation of fair play on which Plaintiffs were entitled to rely.

58.     Moreover, Defendants plotted to conduct a self-interested squeeze-out merger without Plaintiffs' knowledge or consent.  Without appointing any type of independent board, commission, or committee, and while standing on both sides of the transaction, Defendants proceeded (over Plaintiffs' vehement objection) to approve a purported squeeze-out merger that allegedly resulted in the "cancellation" of Plaintiffs' membership interest in Torch.  This grossly unfair, self-interested controller transaction resulted in Defendants claiming that Plaintiffs were essentially "ousted" from Torch for a fraction of what Plaintiffs' interest was/is worth (with

payment to be made a full year after the self-interested transaction).

59.     Upon information and belief, throughout the relevant time period, Defendants were presented numerous opportunities to increase Torch's revenues and value.   Unfortunately, Defendants failed and refused to take advantage of those opportunities because Defendants did not want to "share the spoils" with Plaintiffs.  Rather, Defendants worked in concert and participation with each other to ensure that Plaintiffs were ousted from Torch before Defendants would allow Torch to take advantage of those corporate opportunities.

60.     On information and belief, Defendants received multiple offers to purchase Torch, but Defendants breached their fiduciary duties to Plaintiffs by failing and refusing to disclose those offers, and/or the amount of those offers.  Without Plaintiffs' knowledge or consent, Defendants embarked on a unilateral secret campaign aimed at finding a buyer for Torch at the highest price possible.  Defendants, however, failed to inform Plaintiffs of their campaign, and upon information and belief, missed out on opportunities to sell Torch for a much higher price than what Defendants/Plaintiffs could have otherwise received.

61.     The actions outlined above clearly constitute conduct that substantially defeated Plaintiffs' expectations, which objectively viewed, were both reasonable under the circumstances and central to Plaintiffs' decision to invest in Torch.

62.     Defendants' conduct illustrated a clear effort to place their own interests above those of Plaintiffs, and such conduct constitutes multiple violations of their fiduciary duties to Plaintiffs.  In particular, Defendants breaches of their fiduciary duties to Plaintiffs in the squeeze-out merger should be voided and held invalid.

63.     Defendants' breaches of their fiduciary duties have resulted in significant damage to Plaintiffs, along with a huge benefit to the Defendants.  As a direct and proximate result of

Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer direct damages in an amount to be proven at trial.  Plaintiffs, therefore, seek and are entitled to a judgment against the Defendants for all damages caused by Defendants' wrongful conduct.

64.     Further, Plaintiffs' position as a member of Torch entitles them to a full and comprehensive accounting.  Plaintiffs, therefore, seek an order compelling Defendants to account for all profits of all Defendants, and for all other transactions conducted on behalf of Torch. Plaintiffs further seek full and unfettered access to all of Defendants' books and records (including all individual and entity defendants).

## COUNT 3:
### CONSPIRACY TO BREACH FIDUCIARY DUTIES

65.     Plaintiffs repeat and incorporate by reference the preceding paragraphs as if fully set forth herein.

66.     As set forth above, Defendants have engaged in egregiously tortious conduct.  All Defendants, either in their individual or corporate capacities acted in concert with each other and knowingly committed and participated in affirmative acts in furtherance of Defendants' breaches of Defendants' duties to Plaintiffs.  Defendants' unlawful acts have resulted in significant damage to Plaintiffs.

67.     In committing the wrongful acts alleged herein, Defendants knowingly pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, all Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

68.     During all times relevant hereto, the Defendants collectively and individually knowingly initiated a course of conduct that was designed to, and did: (1) withhold and otherwise

conceal information from Plaintiffs; and (2) deprive Plaintiffs of the fair value of their ownership interest in Torch.   Each Defendant conspired, aided and abetted, and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his/its overall contribution to and furtherance of the wrongdoing.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer direct damages in an amount to be proven at trial.  Plaintiffs, therefore, seek and are entitled to a judgment against the Defendants for all damages caused by Defendants' wrongful conduct.

### COUNT 4:
### UNJUST ENRICHMENT

70.     Plaintiffs repeat and incorporate by reference the preceding paragraphs as if fully set forth herein.

71.     Through the merger agreement—which Defendants entered independent of, and over Plaintiffs' objection—the Defendants were unjustly enriched at the expense of and detriment to Plaintiffs.  Defendants have been enriched by squeezing out Plaintiffs and purportedly acquiring Plaintiffs' membership interest in Torch at a grossly undervalued amount.

72.     Defendants further enriched themselves, to Plaintiffs' detriment, through business opportunities and Torch's continued profits they acquired after they unlawfully deprived Plaintiffs of their interest in Torch.

73.     There is clearly a direct relationship between Defendants' enrichment and Plaintiffs' resulting impoverishment without any justification or adequate remedy at law.

74.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have

suffered and will continue to suffer direct damages in an amount to be proven at trial. Plaintiffs, therefore, seek and are entitled to (1) a judgment against the Defendants for all damages caused by Defendants' wrongful conduct, and (2) an order of this Court disgorging all profits, benefits, and other compensation obtained by all Defendants from their wrongful conduct and fiduciary breaches.

**COUNT 5:**
**FRAUD**

75.     Plaintiffs repeat and incorporate by reference the preceding paragraphs as if fully set forth herein.

76.     As explained above, Defendants represented false material facts as true, actively concealed and prevented Plaintiffs from discovering the truth, and remained silent in the face of a duty to speak. Moreover, Defendants made the false representations and/or omissions with knowledge or belief that the representations or omissions were false, with reckless indifference to the truth, and Defendants' intended to induce Plaintiffs to take action or refrain from acting based on Defendants' representations or omissions. Obviously, Plaintiffs reasonably relied on Defendants' representations and/or omissions (since, among other reasons, Delaware law imposes critically-important fiduciary duties on Defendants).

77.     Defendants induced Plaintiffs to invest in Torch while Defendants knew full well that they would ultimately "oust" Plaintiffs one way or another. After Plaintiffs exercised their rights under the Torch Operating Agreement, Defendants attempted to complete a "coup" that materialized as Defendants' attempted squeeze-out merger. Rather than inform Plaintiffs of their intentions, Defendants proceeded to engage professionals (legal and consulting) to advise Defendants on how to "legally" squeeze Plaintiffs out of Torch. Not only did Defendants fail to disclose crucially important valuations, proposed purchase offers, and/or member distributions,

Defendants failed to appoint an independent board/commission to ensure "entire fairness" in the squeeze-out transaction.

78.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer direct damages in an amount to be proven at trial.  Plaintiffs, therefore, seek and are entitled to a judgment against the Defendants for all damages caused by Defendants' wrongful conduct.

## DAMAGES

79.     Plaintiffs repeat and incorporate by reference the preceding paragraphs as if fully set forth herein.

80.     Through the acts of the Defendants, as mentioned in the preceding paragraphs, Plaintiffs face damage to themselves and to their business reputation.  This kind of injury to Plaintiffs' business reputation is irreparable, and Plaintiffs therefore seek general and special damages in a sum within the jurisdictional limits of this Court.

81.     Moreover, as mentioned in the preceding paragraphs, Defendants' tortious conduct has caused significant damage to Plaintiffs.  Plaintiffs therefore seek specific damages in a sum within the jurisdictional limits of this Court.

## PUNITIVE DAMAGES

82.     Finally, Plaintiffs' injury resulted from Defendants' malice and willful conduct, which entitles Plaintiffs to punitive/exemplary damages under applicable law.

83.     As described above, Defendants secured a lifeline for Torch by inducing Plaintiffs to invest in Torch with full knowledge that Defendants would "oust" Plaintiffs in short order following Torch's success.  After the slightest disagreement over the purchase of a private jet, Defendants engineered a "coup" through a squeeze-out merger.  In the process, Defendants

engaged professionals (legal and consulting) to advise Defendants on how to "legally" squeeze Plaintiffs out of Torch.

84.     Further, not only did Defendants refuse to disclose basic business information, Defendants refused to appoint an independent board/commission to ensure the squeeze-out merger's fairness.

## ATTORNEYS' FEES

85.     Plaintiffs repeat and incorporate by reference the preceding paragraphs as if set forth fully herein.

86.     As a result of Defendants' conduct, Plaintiffs have been forced to retain the undersigned attorney in connection with this action.  Pursuant to applicable law, Plaintiffs are entitled to recover a reasonable sum for attorneys' fees incurred through the trial and, if necessary, the appeal of this cause.

## JURY DEMAND

87.     Plaintiffs hereby respectfully request a trial by jury.

## RELIEF REQUESTED

88.     Plaintiffs request that the Court enter judgment in favor of Plaintiffs and against Defendants for the following:

    a.      Voiding Defendants' merger agreement;

    b.      Restoring Plaintiffs' 10% ownership of Torch;

    c.      Plaintiffs' actual damages in an amount within the jurisdictional limits of this Court;

    d.      Plaintiffs' special and specific damages in an amount within the jurisdictional limits of this Court;

e.      Defendants to account for all profits of all Defendants, and for all other transactions conducted on behalf of Torch;

f.      Punitive/Exemplary damages to the extent permitted by law;

g.      Pre-judgment and post-judgment interest thereon to the extent permitted by law;

h.      Reasonable attorney fees and expenses as allowed by law;

i.      Costs of suit; and

j.      Such other and further relief, whether general or special, at law or in equity, to which Plaintiffs may be justly entitled and which the Court deems appropriate.

Respectfully submitted,

/s/Jay F. Fowler
Jay F. Fowler, KS #10727
Jeff P. DeGraffenreid, KS #15694
Kyle J. Steadman, KS #17205
FOULSTON SIEFKIN LLP
1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206-4466
316-291-9788
316-267-6345 (fax)
jdegraffenreid@foulston.com
jfowler@foulston.com
ksteadman@foulston.com


R. Jeronimo Valdez*, Texas Bar No. 24042079
**VALDEZ | WASHINGTON LLP**
Highland Park Place
4514 Cole Avenue, Suite 600
Dallas, Texas 75205
(214) 361-7800 – Dallas (Main Office)
(469) 327-2629 – Fax
jvaldez@vwlegal.com

*Attorneys for Plaintiffs*
*\*motion to appear pro hac vice forthcoming*