## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| ANDES CAPITAL FINANCING LLC and COEVOLUTION LLC, | ) ) ) |
| *Plaintiffs*, | ) ) ) |
| v. | ) ) |
| CROSSED KEYS LLC, BRIAN WEAVER, JAE CHA, and TORCH RESEARCH LLC, | ) ) ) |
| *Defendants*. | ) ) |

Case No. 21-cv-1270

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

According to Defendants, a limited liability company's ("LLC") minority members are powerless to stop a self-interested transaction that will result in them receiving pennies on the dollars for their ownership interest. Here, the majority member of Torch, acting in concert with the other named Defendants: (1) locked the minority members out of the company; (2) rebuffed the minority members' numerous requests for basic corporate documents; (3) manufactured and utilized a deflated ownership valuation; and (4) attempted to jettison the minority members through an unlawful squeeze-out merger based solely on their conflicted approval and the deflated valuation they had calculated. As explained in the Complaint, Defendants' actions, both individually and collectively, violated multiple provisions in the parties' operating agreement, as well as Delaware law, which is the operating agreement's choice of law. Defendants' motion to dismiss provides no basis for ignoring Defendants' open and flagrant flouting of the applicable law and their contractual obligations. Accordingly, Defendants' motion should be denied.

### I.    FACTS

Defendant Torch Research LLC ("Torch" or "the Company") is a "leading global artificial intelligence (AI) firm that uses machine learning to enable massively scaled, ultra-high

performance data processing." (ECF 1, at ¶11). Currently, Torch is growing exponentially, creating over 100 high paying jobs in 2021 alone and expecting to add an additional 500 such jobs over the next 5 years. (*Id.*). In addition to counting among its clients such blue-chip companies as Microsoft, H&R Block, and General Electric, Torch "is moving strongly into the government sector, where its technology has been deployed across over more than a dozen U.S. federal agencies." (*Id.*). In short, Torch's future appears extremely bright.

This current prognosis, though, is a far cry from the mere flicker that existed in early 2017. Then, needing "lifesaving capital/funding" to keep their dream alive, Defendants Brian Weaver and Jae Cha visited Plaintiffs Andes Capital Financing LLC and Coevolution (collectively, "Plaintiffs") seeking $500,000 in funding from them. (*Id.*, ¶12; ECF No. 1-A, ¶¶5 & 7-12). Ultimately, Plaintiffs decided to invest $750,000 in exchange for a 10% interest in what was to become Torch. (ECF No. 1, ¶9). The remaining 90% of Torch was to be owned by Defendant Crossed Keys LLC ("Crossed Keys"), (ECF No. 1, ¶9), which in turn is owned by Defendants Weaver and Cha, (*id.*, ¶¶4-5).

At around the same time, Torch was formed as a manager-managed Delaware Limited Liability Company. (ECF No. 1-5, ¶2.1). In total, five managers were to run the Company—with Defendant Crossed Keys getting to select three of the managers (one of which was to be Weaver), Plaintiffs getting to select one (Andres Ruzo, who was going to be the Chairman of the Board), and Defendant Crossed Keys and Plaintiffs jointly selecting the remaining manager. (*Id.*, ¶4.1). In addition to being a manager, Weaver also served as, among other things, Chief Executive Officer ("CEO") for Torch. (ECF No. 1, ¶4). Cha serves as Torch's Chief of Innovation, where he is

"intimately    involved    in    the    direction    and    vision    of    Torch."    Torch.AI, https://www.torch.ai/team/jae-cha (last visited February 23, 2022).[1]

Since Torch is a Delaware LLC, the playbook for how the Company was to operate and interact with its members, managers, and officers was the Company's operating agreement ("the Operating Agreement"). Due to the Defendants Weaver's and Cha's initial need for funding, Plaintiffs were able to secure many minority-protecting provisions in the Operating Agreement. Specifically, the following protections were baked into the document: (1) a generous inspection right that gave members the unfettered right to inspect all of the Company's "books and records," (ECF No. 1-5, ¶2.5); (2) specific guidance on when special meetings could be held and how such meetings were to be noticed, (*id.*, ¶4.10); (3) no "capital expenditures" over $50,000 could be made "without the affirmative vote of Members holding all of the Share Interests," (*id.*, ¶4.11); and (4) "Share Interests of a Member in the Company [could] not be Transferred or assigned in any matter voluntarily or involuntarily without the unanimous written consent of the other Members of the Company," (*id.*, ¶5.4). Notably, as explained below in Section III.B.i-ii of this response, the Operating Agreement did not do away with any of the default fiduciary duties that apply in Delaware. In fact, the Operating Agreement actually confirmed their existence and added the extra requirement that any transaction in which a member has a "financial interest" be subject to an "Entire Fairness" review, (*id.*, ¶7.2).

As a manager-managed LLC, the "management and control of [Torch's] business [was to] rest exclusively with [its] Board of Directors." (ECF No. 1-5, ¶4.1). However, beginning around

---

[1]      Although this fact was not pled in the Complaint, it is a proper subject of judicial notice, as Torch's website is a matter of public record. As a result, Plaintiffs respectfully request that the Court take such notice with regard to that fact here. *See, e.g.*, *Hastey on behalf of YRC Worldwide, Inc. v. Welch*, 449 F. Supp. 3d 1053, 1060 (D. Kan. 2020) (taking judicial notice of a press release because it was "a matter of public record available on YRC's website").

June 2019, Defendants began cutting Plaintiffs' manager, and Chairman of the Board, out of decisions they were making. (ECF No. 1, ¶17). Most notably, without Plaintiffs' consent and knowledge, Defendant began shopping Torch around. (*Id.*). In addition to that effort, Defendants sought to do away with the "unanimous" consent protections related to membership transfers and major transactions. (*Id.*). Also, Defendants made multiple attempts to buy Plaintiffs' interest out at between $1,000,000 to $1,500,000. (*Id.*, ¶19). However, realizing the importance that the "unanimity" provisions played in protecting their minority interests and that the value of their interests was well North of Defendants' low-ball offer, Plaintiffs never bit, despite Defendants' representations that valuations for the Company were coming in at roughly $10,000,000. (*Id.*, ¶16). Eventually, Defendants engaged one of the "Big Four" accounting organizations—Deloitte Touche Tohmatsu Limited ("Deloitte")—to provide them with a valuation, which confirmed Plaintiffs' suspicions: Torch's worth was substantial—$130,000,000 to be exact. (*Id.*, ¶¶18-19).

As time went on, Defendants' desire to extricate Plaintiffs from the Company grew. Defendants began to view Plaintiffs as a roadblock to them enjoying the things to which they now felt entitled. For instance, Weaver wanted to purchase a private jet. (*Id.*, ¶20). However, because Plaintiffs viewed this proposed capital expenditure as being unnecessary (likely amounting to corporate waste), and the Operating Agreement required unanimous approval of such a transaction, the jet was never purchased, which did not sit well with Defendants. (*Id.*, ¶20). As Defendants' apparent animosity toward Plaintiffs increased, they began ignoring and neglecting the contractual and fiduciary duties that they owed to Plaintiffs. For instance, despite Plaintiffs' numerous requests for financial statements, tax information, and outstanding purchase offers, Defendants failed to provide Plaintiffs with the most basic corporate records. (*Id.*, ¶24).

Eventually, Plaintiffs were forced to retain counsel in order to protect their interests. Counsel was first enlisted to request and obtain the basic corporate documents that Defendants had refused to produce. (*Id.*, ¶25). Later, when it became clear that Defendants were hellbent on squeezing Plaintiffs out of the Company, despite having no legal way for doing so, counsel was employed to file a temporary restraining order ("TRO") to attempt to stymie Defendants' untoward and illegal actions, which counsel successfully did. (*Id.*, ¶33). Undeterred, though, Defendants charged ahead and gave Plaintiffs notice that they were going to convene a special meeting during which they were going to vote to merge Torch into Defendant Crossed Keys and squeeze Plaintiffs out of the Company for a price to be revealed later ("the transaction in question"). (*Id.*, ¶35). Defendants' service of this notice did not comply with the Operating Agreement. (*Id.*, ¶37).

In response to Defendants' notice, Plaintiffs made numerous objections to Defendants' stated plan. (*Id.*, ¶38). Nevertheless, Defendants proceeded, convening their meeting and voting in favor of merging the Company with its 90% interest holder and squeezing Plaintiffs out for $1,354,248, or approximately 1% of the value that Deloitte had previously assigned to the Company. (*Id.*, ¶40). Significantly, Defendants formed no special committee to review, much less to vote on, the transaction in question. Likewise, no disinterested member approved of the transaction in question. Following the special meeting, Plaintiffs received notes stating that Torch would pay them in a year their respective percentages of $1,354,248. (*Id.*, ¶41; Ex. A-6 & A-7).

As Defendants' individual and collective actions in this case violated the Company's Operating Agreement and Delaware's statutory and common law, Plaintiffs filed suit, alleging five causes of action: (1) breach of contract, (2) breach of fiduciary duty, (3) conspiracy to breach fiduciary duty, (4) unjust enrichment, and (5) fraud. Defendants subsequently filed a motion to

dismiss, seeking to have all of Plaintiffs' claims dismissed with prejudice. For the reasons stated below, Defendants' motion should be denied.

## II.        MOTION TO DISMISS STANDARD

When a complaint includes "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," a defendant's motion to dismiss for failure to state a claim should be denied. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While performing its review, courts must accept as true all well pled allegations and draw all inferences in the plaintiff's favor. *See id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

With regard to fraud claims, they must be plead "with particularity" pursuant to Federal Rule of Civil Procedure 9(b). To satisfy Rule 9(b)'s particularity standard, a plaintiff generally must identify "the circumstances constituting fraud," such as "the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997); *see also Moore v. Climate Corp.*, No. 15-4916-DDC, 2016 WL 4527991, at *3 (D. Kan. Aug. 30, 2016). For fraud claims based on a fraudulent concealment theory, though, the standard is more relaxed, and a plaintiff merely needs to "allege with particularity any facts that would have prevented it from knowing the [concealed facts] and [that] its ignorance was not the result of its own lack of diligence." *Freedom Transp., Inc. v. Navistar Int'l Corp.*, No. 18-2602-JAR, 2020 WL 430213, at *5 (D. Kan. Jan. 28, 2020).

In addition to the complaint's factual allegations, the court may also consider the "attached exhibits and documents incorporated into the complaint" where, as here, "the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (quotations and citations omitted).

## III.   ARGUMENT

Contrary to Defendants' intimation otherwise, Delaware law did not give them a license to steal. Plaintiffs' five-count complaint plausibly states five direct claims against Defendants: (1) breach of contract; (2) breach of fiduciary duty; (3) conspiracy to breach fiduciary duties; (4) unjust enrichment; and (5) fraud. (ECF No. 1, at 12-19). Defendants' shotgun motion does nothing to detract from these claims nor does it provide any basis to dismiss Plaintiffs' claims. Accordingly, Defendants' motion should be denied.

### A.  Count 1 adequately alleges a breach of contract claim.

In their motion, Defendants make the following two arguments regarding Count 1: (i) only Crossed Keys should be named as a defendant in Count 1, as Crossed Keys is the only Defendant that signed the Operating Agreement, and (ii) Count 1 fails to adequately allege a breach. (ECF No. 15, at 17-21). Neither of these arguments holds water and they do not warrant the dismissal of Plaintiffs' breach of contract claim.

### i.   *Crossed Keys is not the only proper defendant for Count 1.*

Defendants contend that Crossed Keys is the only proper defendant for Count 1 because it is "the only part[y] to the Operating Agreement." (ECF No. 15, at 17). While Defendants are correct that Courts generally will not enforce a contract against a non-signer, they ignore the fact that the Delaware Limited Liability Company Act ("the Act") specifically addresses who is bound by an operating agreement. Specifically, section 18-101(9) of the Act states that: (1) "[a] member or manager of a limited liability company or an assignee of a limited liability company interest is bound by the limited liability company agreement whether or not the member or manager or assignee executes the limited liability company agreement [and (2) a] limited liability company is bound by its limited liability company agreement whether or not the limited liability company executes the limited liability company agreement." Therefore, it is entirely proper, and consistent

7

with Delaware law, for Plaintiffs to name Torch (the LLC) and Weaver (one of the LLC's managers), in addition to Crossed Keys (the LLC's controlling member), as defendants in Count 1.[2] *See, e.g.*, *In re F-Squared Inv. Mgmt., LLC*, 633 B.R. 663, 676 (Bankr. D. Del. 2021) ("[U]nder Delaware law, an LLC agreement is a contract binding on the LLC."); *CompoSecure, L.L.C. v. CardUX, LLC*, No. CV 12524-VCL, 2018 WL 660178, at *25 (Del. Ch. Feb. 1, 2018) ("As a member of the Board, Kleinschmidt was a manager. Because he was a manager, Kleinschmidt is deemed to be a party to the LLC Agreement." (Internal citation omitted)), *aff'd in part, rev'd in part and remanded on other grounds*, 206 A.3d 807 (Del. 2018)

### ii.    Plaintiffs have alleged multiple breaches in the Complaint.

According to Defendants, they are entitled to dismissal of Count 1 because Plaintiffs identify only one breach of the Operating Agreement (a violation of Section 7.2) and this identified breach fails to state a claim upon which relief can be awarded. (ECF No. 15, at 7-8 & 17-21).[3] Defendants are wrong on multiple fronts. First, Plaintiffs have identified more than one violation of the Operating Agreement. While it is not necessary for Plaintiffs to identify in the Complaint all of the provisions in the Operating Agreement that have been violated, *see, e.g.*, *Lenexa Hotel, LP v. Holiday Hosp. Franchising, Inc.*, No. 12-2775-KHV, 2013 WL 4736245, at *5 (D. Kan. Sept. 3, 2013) (rejecting the defendants' claim that the "amended complaint fail[ed] to state a claim for breach of contract because it d[id] not identify specific contractual provisions which defendant allegedly breached"), Plaintiffs did explicitly list out a number of other sections that were violated:

---

[2]      Plaintiffs do not assert Count 1 against Mr. Cha, therefore, Plaintiffs do not address Defendants' argument to the extent it relates to him.

[3]      Defendants also argue that relief should not be granted because the Operating Agreement does not afford an appraisal right to Plaintiffs. (ECF No. 15, at 8-9). If Plaintiffs' breach of contract claim was based exclusively on Plaintiffs having an appraisal right, then Defendants' argument may have some merit. However, as shown below, Plaintiffs' contract claim is based on four other provisions. As a result, whether appraisal rights exist here is of no moment and does not control the question of whether a breach claim has been plausibly alleged, which it has.

5.5, (ECF No. 1, ¶¶30-32), and 4.10, (*id.*, ¶37). Furthermore, throughout the Complaint, Plaintiffs described their primary breach theory—namely, that Defendants "conduct[ed] a self-interested squeeze-out merger without Plaintiffs' knowledge or consent" that was "grossly unfair" and in violation of "prohibitions on transfers and approval of major transactions." (*Id.*, ¶¶19, 21, 43 & 58; *accord id.*, ¶¶26 & 31). These descriptions, by their nature, implicate even more sections in the Operating Agreement. Therefore, it is a gross mischaracterization of Count 1 to state, as Defendants do, that the only wrongdoing it alleges is a violation of Section 7.2.

Second, Plaintiffs' allegations adequately allege breach claims under Section 7.2, as well as Sections 5.4, 4.11, and 4.10. Defendants' argument to the contrary is based on the erroneous belief that they had the unfettered right "to enter into a related-party merger." (ECF No. 15, at 18). Defendants concede that an operating agreement can limit a controlling member's and/or a manager's ability to merge, but believe that the Operating Agreement did not do so here. (*Id.* at 7-8). Specifically, Defendants contend that the parties were silent on mergers, and, as a result, Defendants could approve of the transaction in question, even if they were self-interested. (*Id.*). As the proceeding paragraphs show, there are numerous provisions in the Operating Agreement that prohibit Defendants' actions in this case breached.

> ### a. Defendants' self-interested merger violated the contractual duty of entire fairness that Section 7.2 of the Operating Agreement created, as neither a fair price was offered nor a fair process employed.

Defendants confuse Plaintiffs' allegations regarding Section 7.2. It is not Plaintiffs' position, as Defendants contend, that "Section 7.2 creates an affirmative obligation on Crossed Keys not to allow Torch Research to enter into a related-party merger," (ECF No. 15, at 12); rather, it is Plaintiffs' contention that Section 7.2 created a contractual duty of fairness that the transaction in question got nowhere near, a position well founded on Delaware case law.

As noted by the Delaware Supreme Court fairly recently, "[t]o impose fiduciary standards of conduct as a contractual matter, there is no requirement in Delaware that an LLC agreement use magic words, such as 'entire fairness' or 'fiduciary duties.'" *Gatz Properties, LLC v. Auriga Cap. Corp.*, 59 A.3d 1206, 1213 (Del. 2012). Instead, courts are to look to see if "concepts of fairness" are incorporated into the operating agreement. *Zimmerman v. Crothall*, 62 A.3d 676, 703 (Del. Ch. 2013). Delaware courts have interpreted provisions asking whether a "transaction is fair to the Company or its Subsidiary as of the time it is authorized, approved or ratified by the Board of Directors or the Members . . . as effectively calling for review under an entire fairness standard." *Id.* at 703-04. Section 7.2 employs the exact verbiage that the Delaware Chancery court has said requires application of the entire fairness standard. Accordingly, the standard must be applied here.

Unless an operating agreement affirmatively gives a manager or member the right to engage in self-dealing with the company, which the Operating Agreement here does not do, "[i]t is a well-settled principle of Delaware law that[,] where directors stand on both sides of a transaction, they have the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 898 (Del. Ch. 1999) (citation omitted). "The concept of entire fairness has two components: fair dealing and fair price." *Id.* The concept of "fair dealing embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* Fair price, on the other hand, "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.* As the Court might imagine, the fact that "the entire fairness standard applies normally will preclude dismissal of a complaint on a 12(b)(6) motion to

dismiss" if the plaintiff properly alleges such facts." *In re FAH Liquidation Corp.*, 581 B.R. 98, 112 (Bankr. D. Del. 2017). In fact, "[b]esides foreclosing dismissal under Rule 12(b)(6), the requirement of an entire fairness review may also preclude the entry of a final judgment even after discovery on a motion for summary judgment . . . ." *Orman v. Cullman*, 794 A.2d 5, 20 n.36 (Del. Ch. 2002); *accord In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *46 (Del. Ch. Jan. 27, 2021) ("[O]vercoming entire fairness is typically a Sisyphean task for defendants at the pleading stage, where the court must accept all of Plaintiffs' well-pled facts as true and draw every reasonable inference in their favor."). Here, there is simply no way that the entire fairness standard can be resolved in Defendants' favor at this stage in the litigation because the allegations show that Defendants did not engage in fair dealing or offer a fair price.

Starting with fair dealing, the duty requires the fiduciary "not to time or structure the transaction, or to manipulate the corporation's value, so as to permit or facilitate the forced elimination of the minority stockholders at an unfair price." *Boyer*, 754 A.2d at 899 (citation omitted). Defendants cannot make the requisite showing, especially when Plaintiffs' allegations are viewed in the light most favorable to them as Rule 12(b)(6) requires. Among other things, the Complaint alleges that: (1) "one of the 'Big Four' accounting organizations—Deloitte Touche Tohmatsu Limited ("Deloitte")" had "valued Torch at over $130,000,000" (ECF No. 1, ¶¶17-18), yet Plaintiffs' 10% interest in Torch was cashed out for approximately 1% of Deloitte's estimate, (*id.*, ¶40); (2) when Plaintiffs began requesting various corporate documents to which they were entitled to better understand a potential valuation—such as distributions, tax information, and outstanding purchase offers, (*id.*, ¶¶24-25)—Defendants responded by sending to Plaintiffs, via email, notice that they intended to "unilaterally and illegally dispose of Plaintiffs' ownership interest in Torch by approving a 'merger' of Torch and Defendant Crossed Keys," (*id.*, ¶¶29-30);

(3) due to Defendants' unwillingness to stop Defendants' unilateral and illegal attempt to oust them, Plaintiffs sought and received a temporary restraining order from a Texas state court, (*id.*, ¶33); (4) Defendants did not appoint an independent committee to review its unilateral and illegal merger prior to trying to execute it, (*id.*, ¶42), and (5) only interested directors and/or members voted in favor of the transaction in question, (*id.*).

What's more, other than alleging that Defendants "unilaterally decided that Plaintiffs' ownership interest was worth a total of $1,354,258," (*id.*, ¶40), the Complaint is silent as to how Defendants determined that Plaintiffs should receive pennies on the dollars that Deloitte had estimated and provides no basis to infer that Torch's value had decreased. In fact, the Complaint creates the exact opposite inference. (*See, e.g.*, *id.*, ¶11 (noting that Torch is "a leading global artificial intelligence (AI) firm," counts "Microsoft, H&R Block, and General Electric" as clients, and "is moving strongly into the government sector, where its technology has been deployed across over more than a dozen U.S. federal agencies")). The Complaint also notes the significant funding, state subsidies, and contracts that Torch has entered since the transaction in question, which further supports the inference that a fair price was not given and raises serious questions about the timing of the transaction. (ECF No. 1, ¶11).

Based on the case law, the presence of just one of the facts above is usually enough to deny a motion to dismiss. *See, e.g.*, *Voigt v. Metcalf*, 2020 WL 614999, at *24 (Del. Ch. Feb. 10, 2020) (stating that a party's failure to "adequately disclose[]" how a valuation was calculated makes the process unfair). The combination of all of the facts here is fatal to any argument that a fair process was followed here.

Defendants fare no better under the "fair price" prong. Simply put, "[a] large valuation gap . . . is sufficient to support a pleading-stage inference of financial unfairness." *Voigt*, 2020 WL

12

614999, at *23. Based on the payout that Defendants elected to give Plaintiffs, they, for whatever reason, concluded that the value of Torch was in the $10,000,000 range, whereas Deloitte has indicated that Torch's value was well over 10x greater. There is no plausible explanation in the Complaint that can explain away this palpable gulf. Defendants' apparent use of the "low end of the value ranges" also suggests that the price awarded was not fair. *Ark. Teacher Retirement Sys. v. Alon USA Energy, Inc.*, 2019 WL 2714331, at *21 (Del. Ch. June 28, 2019) (concluding that the complaint had adequately alleged an unfair process). Finally, the black-box approach that Defendants took to calculating the value of Plaintiffs' interest militates in favor of finding that an unfair price was given. *See, e.g.*, *id* ("A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price.").

The fact that Section 7.2 states "fair as to the Company" is not a basis to ignore the egregiously low price that Plaintiffs received for their interests, as Defendants suggest. (ECF No. 15, at 20-21). Unsurprisingly, Defendants do not offer any case law support for the proposition that the phrase "fair as to the Company" straightjackets the Court's review and forces it to take a myopic view of the transaction that focuses solely on the Company's welfare. The reason for this is that no such case law exists. Instead, the Delaware Supreme Court has explicitly confirmed that the fairness of the majority's treatment of the minority must be considered "because the extent to which the process leading to the self-dealing either replicated or deviated from the behavior one would expect in an arms-length deal bears importantly on the price determination." *Gatz*, 59 A.3d at 1215. Accordingly, Defendants "bear[] the burden to show that [they] paid a fair price to acquire [Torch]." *Id.* Needless to say, Defendants cannot meet that burden at this stage, especially in light of the facts alleged.

**b.  Defendants' self-interested merger violated Section 5.4, as it sought to transfer the parties' interests without unanimous approval.**

Defendants argue, in a footnote, that Plaintiffs' interest were not "'transferred' to anybody," rather, they were cancelled pursuant to a statutory merger. (ECF No. 15, at 18 n.3). Based on the Operating Agreement, as well as Delaware law, the distinction Defendants attempt to draw is one without a difference.

The Operating Agreement prohibits the "[t]ransfer[] or assign[ment] [of a member's interest] **in any manner voluntarily or involuntarily** without the unanimous written consent of the other Members of the Company." (ECF No. 1-5, at 13 §5.4 (emphasis added)). "Transfer" is a defined term and is given the following definition:

> the passage and the act of effecting the passage of a legal or equitable interest in a Member's Membership Interest pursuant to a sale, exchange, gift, assignment, pledge, grant of a security interest, foreclosure, garnishment, or other conveyance, disposition, or encumbrance and include without limitation the passage of any such interest by judicial order, bequest, intestate, succession, **or other operation of law**.

(*Id.* at 5 §1.1(y) (emphasis added)).

In light of the broad prohibition set forth in Section 5.4, as well as the broad definition of "transfer," the Operating Agreement clearly encompasses a party's loss of its interests like the one that has occurred here. It is well established in Delaware that the use of the phrase "other operation of law" signifies that the parties intended to include not only personal assignment but also transfers that occurred as a matter of law, such a merger, within the definition of "transfer." *See, e.g.*, *MTA Canada Royalty Corp. v. Compania Minera Pangea, S.A. de C.V.*, 2020 WL 5554161, at *5 (Del. Super. Ct. Sept. 16, 2020) ("Section 6.12 plainly prohibits assignments, including by operation of law, and that phrase unambiguously includes assignment through merger."); *Tenneco Automotive, Inc, v. El Paso Corp.*, 2002 WL 453930, at *2 (Del. Ch. Mar. 20, 2002) ("As a general matter in the corporate context, the phrase 'assignment *by* **operation of law**' would be commonly

understood to include a merger." (Emphasis added)); *cf. Star Cellular Tel. Co. v. Baton Rouge CGSA, Inc.*, Civ., 1993 WL 294847, § III.B (Del. Ch. Aug. 2, 1993) (finding that the term "transfer" did not include mergers, but indicating that the result would have been different| if the parties "would have specifically addressed mergers, or they would have provided by appropriate language that 'transfer' means all transfers, including those arising by operation of law"). Therefore, because unanimous consent was not obtained prior to the squeeze-out merger in question, Defendants violated Section 5.4.

### c. Defendants' self-interested merger violated Section 4.11 because it involved spending more than $50,000 for a capital expenditure and an affirmative vote from all members was not had.

As Torch is managed by a Board of Managers, its Board generally has the power and authority to act in a manner in which the majority of the Board approves. (ECF No. 1-5, §4.1). However, there are a number of exceptions to this general rule. One such exception is found at Section 4.11(b), which states, in relevant part:

> Notwithstanding anything in this Agreement to the contrary, no Manager or Member shall take any of the of the following actions on behalf of the Company without the affirmative vote of Members holding all of the Share Interests: (i) Make any capital expenditure in any single transaction or series of related transactions in excess of fifty thousand dollars ($50,000) . . . .

As is clear from the cited language, if a "capital expenditure" worth more than $50,000 is contemplated, then Torch's members, not managers, must make the decision and the decision must be unanimous.

The transaction in question failed to follow the process listed above, and, thus, breached Section 4.11. First, the purchase of Plaintiffs' interests qualifies as a capital expenditure. As recognized many years ago by this District, a company's purchase of its ownership interests, "as a general rule, [is] characterized as [a] capital transaction[]." *Rogers v. United States*, 58 F. Supp. 2d 1235, 1246 (D. Kan. 1999) (citation omitted), *aff'd*, 281 F.3d 1108 (10th Cir. 2002); *accord*

*Jim Walter Corp. v. United States*, 498 F.2d 631, 638 (5th Cir. 1974) ("It has been uniformly held that expenses incurred in connection with the acquisition or issuance of corporate stock and other reorganization or recapitalization expenses ordinarily are nondeductible capital expenditures."); *Frederick Weisman Co. v. Comm'r*, 97 T.C. 563, 572 (1991) ("The cost of the redeemed stock is a capital expenditure, not a deductible expense."); *Cf. Ark. Best Corp. v. Comm'r*, 485 U.S. 212, 222-23, (1988) ("[S]tock is most naturally viewed as a capital asset[.]"). Second, the expenditures in question ($1,174,133.02 and $180,114.98) exceed $50,000. Third, Torch is the one that was to make the expenditure. Fourth, Plaintiffs obviously did not cast an "affirmative vote" in favor of the transaction in question. As a result, the transaction violates Section 4.11(b).

> **d.  Defendants' self-interested merger was the product of a special meeting that was not properly noticed in violation of Section 4.10, and, therefore, was ultra vires.**

Section 4.10 states that (1) special meetings of the members may be called throughout the year, (2) "such meeting[s] shall be properly noticed," and (3) notice "shall be given . . . either personally or by mail." The Complaint alleges that the notice for the meeting in which Defendants attempted to effectuate their self-interested merger was not served personally or through the mail. (ECF No. 1, ¶37). In Delaware, "invalid notice destroys the validity of director or member meetings and the validity of all corporate actions taken therein." *Nevins v. Bryan*, 885 A.2d 233, 245 (Del. Ch.), *aff'd*, 884 A.2d 512 (Del. 2005). Thus, the meeting that Defendants have cited as the basis for purchasing and cancelling Plaintiffs' interests was ultra vires and Defendants' attempts to barrel forward despite that fact violate the parties' Operating Agreement.

What's more, this deficient notice and attendant corporate action cannot be cured by subsequent Board approval. The single purpose for the special meeting that Defendants called was to approve the improper squeeze-out of Plaintiffs. As set forth above and below, Defendants, due to their self-interest in the squeeze out, and their duties owed to Plaintiffs, cannot participate in,

much less approve, a transaction like the one at issue in this case. Accordingly, the action purportedly taken by Defendants is void and ineffectual. *See, e.g.*, *id.* ("Void acts are not ratifiable because the corporation cannot, in any case, lawfully accomplish them.").

Defendants' attempts to explain away their improper service of the special meeting fall flat. According to Defendants, three things justify their deficient notice: (1) pursuant to 6 Del. C. §18-210, a meeting was not even required, thus, improper notice cannot be an issue; (2) 6 Del. C. §18-113 forces parties to accept email service, regardless of what their operating agreement states, and (3) the parties' established course of dealings supports use of email service when the Operating Agreement requires in-person or physical mail service. (ECF No. 15, at 15-16). Defendants' arguments do not hold water.

Defendants' first argument is premised on the belief that Defendants could execute the transaction in question and do so based solely on a simple majority, regardless of whether members or managers were self-interested. As noted above, such a belief cannot be squared with the Operating Agreement, as transfers and capital expenditures of the magnitude in this case required unanimous approval, which Defendants did not have. As for 6 Del. C. §18-113, Defendants misinterpret how the phase "electronic transmission" is used. Section 18-113 does not state that electronic transmission of a document constitutes valid service; rather, it says that electronic transmissions, *e.g.*, emails and possibly texts, are the "equivalent of a written document." While it is true that §18-113 has not been interpreted, Defendants' interpretation makes no sense, especially in light of the definitions that §§18-101(4)-(5) give to "document" and "electronic transmission." Finally, a single email that was drafted and sent in order to help facilitate Defendants' carrying out of their contractual and statutory obligations cannot be used to establish the parties' course of

dealing. *See, e.g.*, *Compton v. Nationwide Mut. Ins. Co.*, 480 F. Supp. 1254, 1257 (W.D. Va. 1979) ("A single transaction does not establish a course of dealing.").

### e. Defendants' baseless refusal to grant Plaintiffs access to Torch's books constituted a violation of Section 2.5.

Pursuant to Section 2.5 of the Operating Agreement, Plaintiffs had the affirmative right "to inspect the Operating Agreement, Share Interest Records, lists of its Members and Managers, books of account, records of proceedings of the Members and Managers and the Company's other books and records and to make copies or extracts therefrom." As alleged in the Complaint, Defendants rebuffed Plaintiffs' multiple requests to have access to Defendants' books and records. (ECF No. 1, ¶¶24-26). Defendants had no recognizable justification for this refusal. Defendants' wrongful denial prevented Plaintiffs from exercising their contractual and statutory rights and enabled Defendants to carry out the illegal transaction in question. It also injured Plaintiffs by forcing them to incur legal expenses to enforce their rights. *See, e.g.*, *Estrada v. Dugow*, 2016 WL 7017412, at *9 (S.D.N.Y. Nov. 30, 2016) ("Additionally, because Defendant breached his duties by failing to allow Plaintiff to inspect the books and records under New York Limited Liability Company Law § 1102(b), Plaintiff suffered damages at least in the form of the cost incurred to compel Defendant to do what the law required."). As a result, it constituted a breach of Defendants' contractual obligations.

### B.  Count 2 adequately alleges a breach of fiduciary duty claim.

Pursuant to the Act, a "member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability agreement may not eliminate the implied contractual covenant of good faith and fair dealing." 6 Del. C. § 18-1101. Therefore, "to decide fiduciary duty claims in the LLC context, the Court must closely examine and interpret the LLC's governing instrument to

determine the parameters of the fiduciary relationship." *Zimmerman v. Crothall*, 62 A.3d 676, 702 (Del. Ch. 2013). Here, ignoring the actual language in the Operating Agreement, the governing case law, and the unilateral and self-interested nature of the transaction in question, Defendants argue that no fiduciary duty or corresponding violation can be found. Defendants are wrong.

### i.    Weaver is not the only Defendant who owes Plaintiffs a fiduciary duty.

Defendants rightfully do not argue that Weaver, as a manager, does not owe Plaintiffs fiduciary duties, as there is nothing in the Operating Agreement stating that he does not. *See, e.g.*, *In re NSC Wholesale Holdings LLC*, 2022 WL 386134, at *9 (Bankr. D. Del. Feb. 9, 2022) ("[I]n the absence of language in an LLC agreement to the contrary, the managers of an LLC owe traditional fiduciary duties of care and loyalty."). Defendants, however, veer off the path when they argue that no one else does.[4] (ECF No. 15, at 21-22).

According to Defendants, "only managers owe fiduciary duties under Delaware law." (*Id.* at 21). While that may be true of "passive members," it is certainly not true of controlling members like Crossed Keys who owns 90% of Torch and is owned by one of Torch's managers and person who is ostensibly the puppet-master behind the unilateral and illegal squeeze out of Plaintiffs. *See, e.g.*, *Kelly v. Blum*, 2010 WL 629850, at *12 (Del. Ch. Feb. 24, 2010) ("[C]ontrolling members in a manager-managed LLC owe minority members the traditional fiduciary duties that controlling shareholders owe minority shareholders."); *accord In re Atlas Energy Res., LLC*, 2010 WL 4273122, at *7 (Del. Ch. Oct. 28, 2010) ("Delaware's case law clearly teaches that, in the absence of provisions in the LLC agreement explicitly disclaiming the applicability of default principles of fiduciary duty, controlling members in a manager-managed LLC owe minority members the

---

[4]    Plaintiffs do not assert Count 2 against Torch, therefore, Plaintiffs do not address Defendants' argument to the extent it relates to it.

traditional fiduciary duties that controlling shareholders owe minority shareholders." (Citation omitted)). Thus, it is clear that Crossed Keys owed Plaintiffs fiduciary duties.

Likewise, Cha owes Plaintiffs fiduciary duties. Defendants imply that Plaintiffs' filings paint Cha as a mere owner and member of Crossed Keys. Not so. For instance, in Plaintiff Ruzo's declaration, he recounts how Cha joined Weaver in a trip to pitch the investment opportunity in Torch and how Cha's solicitation and representations contributed to Plaintiffs making the investment in Torch. (ECF No. 1 Ex. A, ¶¶10 & 13). Furthermore, Torch's own website lists Cha as its "Co-Founder and Chief of Innovation," who is "intimately involved in the direction and vision of Torch." Thus, Cha qualifies as a "high level officer" of Torch, and, as such, owes fiduciary duties to Plaintiffs. *CMS Investment Holdings, LLC v. Castle*, 2015 WL 3894021, at *18 (Del. Ch. June 23, 2015) (finding that non-managers owed fiduciary duties to the LLC); *see also Triple H Family Limited Partnership v. Neal*, 2018 WL 3650242, at *14 (Del. Ch. July 31, 2018) (noting that "Delaware case law has recognized that a person who is not named or designated a manager in the LLC's governing document may nevertheless be deemed a de facto manager and fiduciary of the LLC," and finding that a party was a de facto manager with fiduciary duties based on his "involve[ment] [and] control over [the Company's] management").

> ii.      ***The Operating Agreement does not disclaim the fiduciary duties owed by Defendants, thus, Delaware's default fiduciary duties of loyalty and care apply.***

In August 2013, the Delaware Legislature amended the Act to state that, in the absence of an affirmative disclaimer in a company's operating agreement, "the rules of law and equity relating to fiduciary duties and the law merchant, shall govern." 6 Del. C. § 18-1104. This "amendment made clear that default principles of fiduciary duty apply under the LLC Act and rejected the

purely contractarian view of LLCs."[5] *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *30 n.23 (Del. Ch. Feb. 28, 2020). Therefore, if "[t]he Operating Agreement does not modify or limit the fiduciary owed under Delaware law, [then] the default fiduciary duties of loyalty and care apply." *In re NSC Wholesale Holdings, LLC*, --- B.R. ----, 2022 WL 386134, at *9 (Bankr. D. Del. Feb. 9, 2022).

Citing to Section 4.5 of the Operating Agreement and 6 Del. C. § 18-1101(e), Defendants contend that their fiduciary duties have been "eliminated." (ECF. No. 15, at 22-23). While Plaintiffs agree that §18-1101 permits an operating agreement to do such a thing, the Operating Agreement here does not. Defendants' argument that it does is based on at least three fallacies. First, to the extent Section 4.5 applies in a given scenario, it merely provides Defendants "with exculpation against liability for certain types of claims. It does not restrict, modify, or eliminate fiduciary duties." *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 663 (Del. Ch. 2012) (finding that a provision similar to Section 4.5 did not eliminate duties as the defendants in that case argued it did). In fact, "[r]ather than eliminating fiduciary duties, [Section 4.5] recognizes their continuing existence," as "[g]ross negligence is the standard for evaluating a breach of the duty of care" and "[w]illfull misconduct is one standard for evaluating whether a fiduciary breached the duty of loyalty by acting in bad faith." *Id.* In short, Section 4.5 "(i) assumes that default fiduciary duties exist, (ii) limits only the potential availability of a monetary remedy, not the potential for injunctive or other equitable relief, and (iii) restores the availability of damages as a remedy for, among other things, gross negligence and willful misconduct." *Id.*

---

[5]     Most notably, this amendment addressed the concern raised in *Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 849 (Del. Ch. 2012), namely, that the then-existing law did "not plainly state" whether "the traditional fiduciary duties of loyalty and care apply default as to managers or members of a limited liability company."

Second, Defendants' argument, at most, would cover only Weaver, as Section 4.5 is explicitly limited to just "Managers"—*i.e.*, it is of no help to Crossed Keys or Cha. *See, e.g.*, *In re Sols. Liquidation LLC*, 608 B.R. 384, 405-06 (Bankr. D. Del. 2019) (refusing to extend an operating agreement's exculpatory clause to officers of the LLC because the operating agreement "unambiguously limit[ed] the liability of the company's managers with no reference to the company's officers"); *In re Atlas Energy Res., LLC*, 2010 WL 4273122, at *9 (Del. Ch. Oct. 28, 2010) (finding that the exculpatory clause in question did not apply to the "controlling unitholder" because, "although the LLC Act explicitly allows modification or elimination of members' fiduciary duties, [the clause there] eliminates only directors and officers' fiduciary duties")

Third, Defendants' argument provides no cover for breaches of the duty of loyalty, which have been alleged here. As noted above, carveouts to exculpatory clauses for "willful" behavior effectively exclude violations of the duty of loyalty from exculpation. "A breach of the duty of loyalty is established when the evidence demonstrates that a director was on both sides of the transaction or the director derived any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *In re Herchinger Inv. Co. v. Del.*, 327 B.R. 537, 549 (D. Del. 2005). In the Complaint, Plaintiffs have alleged, in spades, that Defendants were on both sides of the transaction and stood to enjoy a tremendous windfall from their unilateral, self-interested, and illegal squeeze-out of them. This is all that is needed to render Section 4.5 useless at this stage.

### iii.     Plaintiffs have stated a plausible claim against the Defendants.

Incredibly, Defendants contend that their refusal to provide basic financial documents and records and the fact that they were on both sides of the squeeze-out transaction do not violate their fiduciary duties. (ECF No. 15, at 23-26). Defendants are wrong once again.

**a. Defendants' refusal to grant access to Torch's books and records constitute a violation of Defendants' fiduciary duties.**

Starting with their refusal to provide basic financial documents and records, Defendants attempt to defend their misconduct on three grounds: (1) Plaintiffs' allegations regarding their refusal are too "conclusory and unsupported" to be credited; (2) Defendants had no fiduciary duty to provide access to basic financial documents, even to a fellow manager, and (3) Plaintiffs could not have done anything with the requested books and records even if they had received them. (*Id.* at 17-19). Each one of Defendants' arguments misses the boat.

Regarding the quality of Plaintiffs' allegations relating to Defendants' refusal, Plaintiffs' statements easily exceed the relevant standard. According to Defendants, Plaintiffs' allegation that Defendants "received multiple offers to purchase Torch but Defendants . . . refus[ed] to disclose those offers, and/or the amount of those offers" is "too conclusory and unsupported" to be actionable. (ECF No. 15, at 24). Defendants' objection is incomplete, unfounded, and should be rejected. Plaintiffs did not seek information only on the offers Defendants had received, but they also sought other basic corporate information such as distributions, tax, financial statements. (ECF No. 1, ¶¶24, 29 &56). Also, with regard to Defendants' offers, which Defendants wrongfully withheld from Plaintiffs, Plaintiffs can make good-faith allegations based on "information and belief." *See, e.g.*, *MCWB Rock Road, LLC v. C&W Facility Servs., Inc.*, No. 21-1022-SAC, 2022 WL 168221, at *2 (D. Kan. Jan. 19, 2022) ("Allegations 'upon information and belief' may be made 'so long as the complaint sets forth the factual basis of the belief.'" (Citation Omitted)). Plaintiffs' status as a member of Torch, along with other alleged communications that Plaintiffs had with Defendants and the valuations that Defendants had performed, provides an adequate basis to substantiate Plaintiffs' "information and belief" allegations at this point. Finally, how much clearer, how much more factual could a statement regarding offers and Defendants' refusal to

afford Plaintiffs access to them be than to say that Defendants received offers and did not permit Plaintiffs to see them? This objection is white noise and should be treated as such.

Defendants' duties argument is misguided for at least two reasons. First, Plaintiffs' theory is not based solely on the fact Defendants did not grant them access to records; no, it is also based on the fact that Defendants' refusal was motivated by a desire to advance their own self-interests, which is, undoubtedly, a violation of Defendants' fiduciary duties. *See, e.g., William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011) (affirming the Chancery Court's finding that the defendants had breached their fiduciary duties because the defendants had "acted in their own self interest by orchestrating the sale of Del Bay's sole asset . . . on terms that were favorable to them"). Second, it ignores the fact that Plaintiffs' manager, as opposed to just Plaintiffs, had requested the books and records. As even 6 Del. C. 18-305(b) recognizes, managers have an unfettered right to "examine all of [a company's] information" so long as the access is "reasonably related to the position of the manager." Needless to say, determining whether outstanding offers warrant consideration of a corporate action certainly are related to Plaintiffs' manager's position. Defendants have not cited to a single case in which similar facts were found not to support a fiduciary claim. This case should not be the first.

As for Defendants' "no harm, no foul" argument, it also falls flat. It does so because it is based on the erroneous belief that Defendants could do whatever they wanted to because Crossed Keys owned 90% of Torch. As explained above in Section III.A of this response, the Operating Agreement, and, thus, Delaware law, did not afford Defendants carte blanche power. No, Defendants were significantly limited on a number of fronts—entire fairness, unanimous approval for transfers of interests, and unanimous approval for capital expenditures in excess of $50,000. Therefore, in order for a transaction like the one contemplated by Defendants to be carried out,

Plaintiffs' minority interest could not simply be ignored. In fact, in light of the fact that Defendants were conflicted, Plaintiffs' approval of the proposed transaction was essential. Thus, Defendants' intimation that Plaintiffs were "powerless to change the course of events" is just wrong.

### b. Defendants' self-interested merger violated their fiduciary duties.

Defendants' argument that their position on both sides of the transaction in question is permissible is based entirely on the belief that 6 Del. C. § 18-209 permits a merger if 50% of the members approve it, regardless of what the parties' operating agreement states. (ECF No. 15, at 25-26). Tellingly, Defendants cannot find a single LLC case to support this proposition. And no such case exists given that Defendants' position is completely inconsistent with Delaware law. For starters, the gap-filling rule set forth in § 18-209 does not apply because the Operating Agreement establishes restrictions on simple majority approval in the following circumstances (all of which are present here): (1) transfer of ownership interest, (2) capital expenditures greater than $50,000, and (3) transactions in which members have a financial interest. These contractual restrictions trump the Act's gap fillers. Additionally, the Operating Agreement did not do away with Delaware's default fiduciary duties; rather, it actually confirms that they still exist. Accordingly, § 18-209, and the notion that it legitimizes a squeeze out that is approved solely by the self-interested members, cannot be relied upon to justify Defendants' actions.

Without any statutory protection, Defendants' actions clearly violate their fiduciary duties, which, at a minimum, "include the duty not to cause the corporation to effect a transaction that would benefit the fiduciary at the expense of the minority stockholders." *Kelly v. Blum*, 2010 WL 629850, at *12 (Del. Ch. Feb. 24, 2010). Here, it has been alleged that Defendants, motivated by their own self-interest and standing on both sides of the transaction, attempted to effectuate a squeeze-out merger that would result in them, and them alone, owning Torch and exclusively

enjoying the benefits flowing from the increase of their ownership interest resulting from the wrongful elimination of Plaintiffs' 10%. While Defendants' desire is understandable, it is nevertheless illegal and in violation of their fiduciary duties. As a result, Defendants' attempt to dismiss Count 2 should be rejected.

### C.  Count 3 plausibly alleges a conspiracy to commit a breach of a fiduciary duty.

Defendants' argument that Plaintiffs failed to allege a plausible conspiracy claim is based on the belief that "the Operating Agreement eliminates the managers' fiduciary obligations" and "non-managers cannot be held liable for conspiracy to breach obligations that do not exist." (ECF No. 15, at 27). In other words, if Weaver owed Plaintiffs' fiduciary duties, then Defendants' motion as it relates to Count 3 fails.

As shown in the previous section, Section 4.5 did not eliminate Weaver's fiduciary duties; rather, it actually confirmed that they still exist. Therefore, because the Operating Agreement does not disclaim Weaver's default fiduciary duties, Weaver, along with Crossed Keys and Cha, engaged in a self-interested transaction that violated the Operating Agreement, and Plaintiffs lost out on millions of dollars in compensation as a result of Defendants' actions, a plausible conspiracy claim has been alleged. *See, e.g.*, *CMS Inv. Holdings v. Castle*, 2015 WL 3894021, at *21-22 (Del. Ch. June 23, 2015) (denying motion to dismiss on the plaintiffs' civil conspiracy claim that was based on the argument that "all of Plaintiff's other causes of actions are insufficient" after it found that the plaintiff had adequately alleged its other claims).

### D.  Count 4 alleges a plausible unjust enrichment claim.

Defendants' contention that Plaintiff has failed to state a plausible unjust enrichment claim rests on two bases: (1) such a claim cannot exist in a case in which a contract is present and (2) Plaintiffs have failed to allege all of the elements of an unjust enrichment claim. (ECF No. 15, at 27-29). Neither basis provides a ground to dismiss Count 4.

While it is true that Plaintiffs will likely not be able to recover on both a breach of contract and an unjust enrichment theory, this fact does not warrant dismissal at this early stage of the litigation. Delaware courts, like "[o]ther courts in jurisdictions that similarly prevent a party from recovering under unjust enrichment where a contract exists nevertheless have allowed a party to plead in the alternative based on both breach of contract and unjust enrichment." *In re Mortg. Lenders Network, USA, Inc.*, 395 B.R. 871, 880 (Bankr. D. Del. 2008) (collecting cases); *accord In re FAH Liquidating Corp.*, 2018 WL 2793944, at *6 (D. Del. June 11, 2018) (affirming the bankruptcy court's determination that, "at the pleading stage, it [i]s entirely acceptable to pursue alternative theories, even where the claims are for breach of contract and for unjust enrichment"). Dismissal is all the more inappropriate here where Defendants are seeking dismissal of Plaintiffs' other claims, and, thus, there is the possibility that Plaintiffs' "other legal remedies . . . may become[] foreclosed." *In re FAH Liquidating Corp.*, 2018 WL 2793944, at *7 (citing this fact as support for denying a motion to dismiss). Thus, Defendants' first argument cannot carry the day.

The same is true of Defendants' second argument, which is based on the claim that Plaintiffs have failed to adequately plead two of unjust enrichment's five elements—namely, the impoverishment and absence of justification elements. (ECF No. 15, at 23). The Court can make short shrift of this argument. First, just because Defendants believe that "nearly doubling" Plaintiffs' initial investment is a sufficient return does not mean that Defendants did not impoverish Plaintiffs through their actions. Impoverishment does not mean destitute; rather, it merely means the deprivation of a benefit, which could be a financial loss. *See, e.g., Nemec v. Shrader*, 991 A.2d 1120, 1130 n.37 (Del. 2010) ("'Impoverishment' does not require that the plaintiff seeking a restitutionary remedy suffer an actual financial loss, as distinguished from being deprived of the benefit unjustifiably conferred upon the defendant."). Had Plaintiffs' interest been

27

properly valued, and had Plaintiffs elected to sell, they would have received over $10,000,000. Instead, based on Defendants' self-interested merger, they received approximately $1,300,000. Counsel has not located a case where a nearly $9,000,000 loss was deemed not to satisfy the impoverishment element—probably because no such case exists.

With respect to Defendants' "absence of justification" argument, it, like most of Defendants' other arguments, is based on the erroneous belief that "Plaintiffs had no right to prevent the merger or object to its financial terms as a minority interest holder." (ECF No. 15, at 29). As set forth above, this position cannot be squared with the Operating Agreement. As a result, Defendants' unjust enrichment arguments also fail.

### E.  Count 5 plausibly alleges a fraud claim.

Plaintiffs' fraud claim is based on a fraudulent concealment theory. *See, e.g.*, *Chesapeake Ins. Advisors, Inc. v. DeSola*, 2018 WL 565306, at *4 (Del. Super. Ct. Jan. 24, 2018) (noting that Delaware recognizes the tort of fraudulent concealment). Defendants advance two arguments with regard to that theory: (1) Plaintiffs have failed to plead such a theory with the requisite particularity, (ECF No. 15, at 30-31), and (2) causation is wanting because, even if Plaintiffs had received the requested information, Plaintiffs would have been "powerless to change the course of events," (*id.* at 33). Like the myriad of arguments Defendants made earlier in their brief, these last two arguments do not stand up to scrutiny.

Starting with particularity, it is applied differently in the concealment context than it is in the affirmative misrepresentation context. *See, e.g.*, *Freedom Transp., Inc. v. Navistar Int'l Corp.*, No. 18-2602-JAR, 2020 WL 430213, at *5 (D. Kan. Jan. 28, 2020). For obvious reasons, courts do not require a plaintiff to plead at the same level of specificity because, as the old adage goes, "you don't know what you don't know." *Bonfield v. AAMCO Transmissions, Inc.*, 708 F. Supp. 867, 875 (N.D. Ill. 1989) ("Like Sherlock Holmes' dog that did not bark in the night, an actionable

omission obviously cannot be particularized as to the time, place, and contents of the false representations or the identity of the person making the misrepresentation." (Internal quotation marks omitted)). Here, Plaintiffs made numerous attempts to acquire the information that would be necessary for them to make informed decisions about the way ahead for Torch, attempts that Defendants rebuffed. Due to Defendants' stonewalling, Plaintiffs' efforts to state their allegations with greater particularity were obviously stymied. Nevertheless, Plaintiffs, in good faith, and based on information and belief, have alleged that Defendants (*i.e.*, the controlling owner of Torch, the Chief Executive Office, manager, and Chief Innovation Officer) withheld offers that they had recently received, as well as other corporate information, that would have disclosed the actual going rate for Torch and what the potential market was. This is all that is needed for particularity purposes in light of Defendants' actions.

As for Defendants' "no harm, no foul" argument, it fails for the same reason that it did above: Defendants' misread the Operating Agreement and what their duties are underneath it. The Operating Agreement afforded Plaintiffs, as members, a robust inspection right. Furthermore, Plaintiffs' manager was entitled to access to Torch's book and records in order to fulfill his manager role and be able to advise the Company and assist it in carrying out its operations. Additionally, and possibly most importantly, Defendants could not lawfully carry out the transaction in question without Plaintiffs' approval of it. Based on the information that Plaintiffs believe is in the documents Defendants have withheld, it would not provide the necessary approval because it would show Defendants' squeeze-out price to be woefully inadequate. Therefore, contrary to Defendants' claims otherwise, granting Plaintiffs the access that they sought, would not be a useless endeavor. Accordingly, causation is not wanting here and Defendants' motion, as it relates to fraud, should be denied.

## IV.    CONCLUSION

For the reasons stated herein, Defendants have failed to provide a basis to dismiss Plaintiffs' claims. Accordingly, Plaintiffs respectfully request that Defendants' motion to dismiss be denied.

Respectfully submitted,

*/s/Jay F. Fowler*
Jay F. Fowler, KS #10727
Jeff P. DeGraffenreid, KS #15694
Clayton J. Kaiser, KS #24066
FOULSTON SIEFKIN LLP
1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206-4466
316-291-9788
316-267-6345 – Fax
jdegraffenreid@foulston.com
jfowler@foulston.com
ckaiser@foulston.com


R. Jeronimo Valdez, Texas Bar No. 24042079 (Appearing *Pro Hac Vice*)
VALDEZ | WASHINGTON LLP
Highland Park Place
4514 Cole Avenue, Suite 600
Dallas, Texas 75205
(214) 361-7800 – Dallas (Main Office)
(469) 327-2629 – Fax
jvaldez@vwlegal.com

*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on the 28th day of February, 2022, I electronically filed the foregoing with the District Court using the e-filing system, which will send notice of electronic filing to counsel of record.

<u>*/s/Jay F. Fowler*</u>
Jay F. Fowler, KS #10727