**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| ANDES CAPITAL FINANCING LLC and COEVOLUTION LLC, | |
| Plaintiffs, | |
| v. | Case No. 6:21-cv-01270-KHV-JPO |
| CROSSED KEYS LLC, BRIAN WEAVER, JAE CHA, and TORCH RESEARCH LLC, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF THE NATURE OF THE MATTER BEFORE THE COURT ............ 1

II.   STATEMENT OF UNDISPUTED MATERIAL FACTS ("SOF") .................................. 3

    A.    The Parties .................................................................................................. 3

    B.    The Negotiation and Execution of the Operating Agreement ................................ 5

    C.    The 2020 Merger ........................................................................................ 7

    D.    WestCap's Investment in Torch ..................................................................... 9

    E.    Plaintiffs' Failure to Identify Bases for Fraudulent Inducement Claim ............... 10

III.  ARGUMENT IN SUPPORT OF SUMMARY JUDGMENT .......................................... 12

    A.    Generally Applicable Legal Principles .......................................................... 12

        1.    The Delaware Limited Liability Company Act ........................................ 12

        2.    Delaware Law Permits Mergers Over Minority Dissent, Absent a
            Contractual Agreement to the Contrary .................................................. 12

        3.    Delaware Principles of Contract Interpretation ........................................ 13

    B.    Defendants Are Entitled to Summary Judgment as to the Claimed Breach of
        Section 4.11(b)(i) of the Operating Agreement (re "Capital Expenditures") ....... 15

        1.    Paying Plaintiffs for their cancelled shares is not a "capital
            expenditure," under the ordinary meaning of that phrase. ....................... 16

        2.    Extrinsic evidence further confirms that the right to veto "capital
            expenditures" was not intended to block transactions regarding
            Torch's ownership. .............................................................................. 17

        3.    Plaintiffs had no right to veto the expenditure of Torch funds after
             Plaintiffs were no longer members of Torch. ......................................... 19

        4.    Plaintiffs were not harmed by the alleged expenditure. ............................ 20

    C.    Defendants Are Entitled to Summary Judgment as to the Claimed Breach of
        Section 5.4 of the Operating Agreement (re "Transfers" of Interests) ................ 21

        1.    The Operating Agreement restrictions on transfers are inapplicable. ....... 21

        2.    The anti-assignment clause applies to some mergers, but not the
            2020 Merger. ..................................................................................... 24

        3.    Plaintiffs' deal counsel confirmed the ordinary meaning of the
            transfer restrictions. ............................................................................ 25

        4.    No interests were transferred as a result of the merger. ........................... 26

5.      Even if Crossed Keys succeeded to Plaintiffs' Preferred
        Membership Interests, Plaintiffs were not injured by the breach of
        contract..............................................................................................28

D.    Defendants Are Entitled to Summary Judgment as to the Claimed Breach of
      Fiduciary Duties.......................................................................................29

      1.      The scope of applicable fiduciary duties was limited by the parties
              to those set out in Section 7.2 of the Operating Agreement. ...................30

      2.      Section 4.5 of the Operating Agreement eliminates Defendants'
              liability because there is no evidence supporting Plaintiffs'
              allegation that Defendants intentionally violated Plaintiffs' rights. .........32

E.    Defendants Are Entitled to Summary Judgment as to the Claimed Conspiracy to
      Breach Fiduciary Duties .............................................................................35

      1.      Weaver and Crossed Keys cannot conspire with each other, as a
              matter of Delaware law...........................................................................35

      2.      Because there was no breach of fiduciary duty, there can be no
              conspiracy claim. ....................................................................................36

F.    Defendants Are Entitled to Summary Judgment as to the Unjust Enrichment
      Claim........................................................................................................36

G.    Defendants Are Entitled to Summary Judgment as to the Fraudulent Inducement
      Claim........................................................................................................38

H.    Plaintiffs Have Abandoned Their Baseless Claims Against Jae Cha ..................40

IV.    CONCLUSION...........................................................................................40

## <u>TABLE OF AUTHORITIES</u>

<span style="font-variant: small-caps;">Cases</span>

*Accident Ins. Co., Inc. v. U.S. Bank Nat'l Ass'n*,
    No. 21-1504, 2022 WL 3713512 (4th Cir. Aug. 29, 2022) ....................................................14

*AIG Retirement Servs., Inc. v. Altus Finance S.A.*,
    No. 05-cv-1035, 2011 WL 13213601 (C.D. Cal. Aug. 26, 2011) ..........................................24

*Anschutz Corp. v. Brown Robin Cap., LLC*,
    No. CV 2019-0710-JRS, 2020 WL 3096744 (Del. Ch. June 11, 2020) ...........................35, 36

*Applied Genetics Intern., Inc. v. First Affiliated Secs., Inc.*,
    912 F.2d 1238 (10th Cir. 1990) ...........................................................................................34

*Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*,
    No. 2018-0372-JTL, 2019 WL 4927053 (Del. Ch. Oct. 7, 2019) ........................................36

*Bank of N.Y. Mellon v. Commerzbank Cap. Funding Trust II*,
    65 A.3d 539 (Del. 2013) ......................................................................................................23

*Cont'l Materials Corp. v. Valco, Inc.*,
    No. 14-CV-02510, 2019 WL 13167107 (D. Colo. Sept. 23, 2019).......................................39

*Dawson v. Pittco Capital Partners, L.P.*,
    No. 3148-VCN, 2012 WL 1564805 (Del. Ch. Apr. 30, 2012) ..............................................27

*Doerge v. Crum's Enters., Inc.*,
    No. 05-1019-JTM, 2007 WL 1586024 (D. Kan. May 31, 2007)...........................................40

*Grove v. Brown*,
    No. 6793-VCG, 2013 WL 4041495 (Del. Ch. Aug. 8, 2013)...........................................12, 13

*In re Motor Fuel Temperature Sales Practice Litigation*,
    MDL No. 1840, 2013 WL 3795206 (D. Kan. July 19, 2013)................................................37

*In re Reliance Secs. Litig.*,
    135 F. Supp. 2d 480 (D. Del. 2001).......................................................................................34

*In re USA Detergents, Inc.*,
    418 B.R. 533 (Bankr. D. Del. 2009) .................................................................................35, 36

*J.C. Trading Ltd. v. Wal-Mart Stores, Inc.*,
    947 F. Supp. 2d 449 (D. Del. 2013).......................................................................................38

*Jordan v. Mirra*,
    No. 14-cv-1485, 2022 WL 610713 (D. Del. Feb. 22, 2022).......................................15, 25, 26

*Lorillard Tobacco Co. v. Am. Legacy Found.*,
 903 A.2d 728 (Del. 2006) ...............................................................14, 16

*McClure v. Leafe*,
 No. 17-13106, 2018 WL 4637339 (E.D. Mich. Sept. 27, 2018)...................................13, 17, 29

*McGinnis Commercial Real Estate Co. v. Jankes*,
 No. CPU5-14-000701, 2016 WL 1221427 (Del. Ct. Common Pleas Mar. 29,
 2016) ...............................................................................................14

*Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*,
 62 A.3d 62 (Del. Ch. Ct. 2013)...............................................................25

*MTA Canada Royalty Corp. v. Compania Minera Pangea, S.A. de C.V.*,
 No. CV N19C-11-228 AML, 2020 WL 5554161 (Del. Super. Ct. Sept. 16,
 2020) ...............................................................................................24, 25

*Nordwald v. Brightlink Comms., LLC*,
 603 F. Supp. 3d 1030 (D. Kan. 2022) ...............................................................40

*Norton v. K-Sea Transp. Partners L.P.*,
 67 A.3d 354 (Del. 2013) ...............................................................29, 30, 31

*Orderly Health, Inc. v. NewWave Telecom & Techs., Inc.*,
 No. 20-1441, 2021 WL 4592268 (10th Cir. Oct. 6, 2021) ...............................14

*Palucki v. Sears, Roebuck & Co.*,
 879 F.2d 1568 (7th Cir. 1989) ...............................................................34

*Peterson v. AWJ Global Sustainable Fund, LP*,
 No. 15-cv-00650, 2015 WL 5921225 (C.D. Cal. Oct. 11, 2015) ...............................14

*Rehoboth Bay Homeowners' Ass'n v. Hometown Rehoboth Bay, LLC*,
 252 A.3d 434 (Del. 2021) ...............................................................14, 16

*Riverside Risk Advisors LLC v. Chao*,
 No. 2019-0789-KSJM, 2022 WL 14672745 (Del. Ch. Oct. 26, 2022)...........................20, 28

*Rothschild Int'l Corp. v. Liggett Grp., Inc.*,
 463 A.2d 642 (Del. Ch. 1983), aff'd, 474 A.2d 133 (Del. 1984) ...............................27

*Star Cellular Tel. Co., Inc. v. Baton Rouge CGSA, Inc.*,
 No. 12507, 1993 WL 294847 (Del. Ch. Ct. Aug. 2, 1993).........................................16, 21, 24

*Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*,
 206 A.3d 836 (Del. 2019) ................................................................. passim

*Vitalink Pharmacy Servs., Inc. v. Grancare, Inc.*,
 No. 15744, 1997 WL 458494 (Del. Ch. Aug. 7, 1987) ...............................14

iv

*Well Thrive Ltd. v. Semileds Corp.*,
    No. 17-794, 2020 WL 7490109 (D. Del. Dec. 21, 2020) ......................................................36

*Wilson v. Muckala*,
    303 F.3d 1207 (10th Cir. 2002) ..........................................................................................39

*Windsor I, LLC v. CWCapital Asset Mgmt. LLC*,
    238 A.3d 863 (Del. 2020) ....................................................................................................36

*Wood v. Baum*,
    953 A.2d 136 (Del. 2008) .............................................................................................32, 33

*Yavuz v. 61 MM, Ltd.*,
    465 F.3d 418 (10th Cir. 2006) ............................................................................................14

**STATUTES**

6 Del. C. §§ 8-101 *et seq.* ...............................................................................................................22

6 Del. C. §§ 8-301 *et seq.* ...............................................................................................................22

6 Del. C. § 8-302 .............................................................................................................................22

6 Del. C. §§ 18-101 et seq. .............................................................................................................12

6 Del. C. § 18-209(b) ..............................................................................................12, 13, 21, 27, 29

6 Del. C. § 18-1101(b) ....................................................................................................................12

6 Del. C. § 18-1101(e) ....................................................................................................................29

**OTHER AUTHORITIES**

Fed. R. Civ. P. 21 ..............................................................................................................................1

Black's Law Dictionary ......................................................................................................16, 17, 19

Franklin A. Gevurtz, *Why Delaware LLCs?*, 91 Or. L. Rev. 57, 121 (2012)................................12

Defendants Crossed Keys LLC, Brian Weaver, and Jae Cha[1] submit this Memorandum in Support of Defendants' Motion for Summary Judgment.  Crossed Keys, Mr. Weaver, and Mr. Cha seek summary judgment in their favor on the claims brought by Plaintiffs Andes Capital Financing LLC and Coevolution LLC, as modified by the Pretrial Order [ECF No. 109] ("PTO").

## I.    STATEMENT OF THE NATURE OF THE MATTER BEFORE THE COURT

Plaintiffs were minority investors in Torch Research, LLC ("Torch"), a Kansas-based artificial intelligence firm that provides software and machine learning capabilities to customers, including the United States government and military.  Plaintiffs held a collective 10% of Torch's equity until October 9, 2020, when their interests in the company were eliminated in connection with a legal merger under Delaware law.  Following the merger, Plaintiffs rejected the cash value of their shares—the equivalent of a 2x return on their initial investment.  They chose instead to file suit, bringing five causes of action under Delaware law: (i) breach of contract, (ii) breach of fiduciary duties, (iii) conspiracy to breach fiduciary duties, (iv) unjust enrichment, and (v) fraud. PTO § 4(a).  All of these claims fail as a matter of law.

Roughly half of the case went away at the Rule 12 stage, when the Court sustained Defendants' motion to dismiss in part.  *See* ECF No. 51 (MTD Order) at 22; PTO at 25 n.1.  The following claims remained in the case:

> (1) that Torch, Weaver and Crossed Keys breached Section 4.11 of the operating agreement because they made a capital expenditure over $50,000 without putting the decision to a vote of all members, (2) that Torch, Weaver and Crossed Keys breached Section 5.4 of the operating agreement because they transferred plaintiffs' share interests without the consent of all members, (3) that Crossed Keys, Weaver and Cha breached their fiduciary duties by depriving plaintiffs of the fair value of their ownership interest when Torch merged with Crossed Keys, (4) that Crossed Keys, Weaver and Cha conspired to breach their fiduciary duties to plaintiffs by acting in concert to conceal information and deprive plaintiffs of the fair value of

---

[1] Defendant Torch Research, LLC is moving concurrently for dismissal under Fed. R. Civ. P. 21 as a non-diverse party.  The Court should dismiss Torch, as a non-diverse dispensable party, and retain jurisdiction over the diverse Defendants, entering summary judgment in their favor.

their ownership interests in Torch, (5) that Torch, Weaver and Cha were unjustly enriched by squeezing out plaintiffs and acquiring their membership interests in Torch at a grossly undervalued amount and (6) that defendants fraudulently induced them into investing in Torch while knowing that defendants would later oust them from the company.

ECF No. 51 (MTD Order) at 22-23.  Now, on a fully developed record, summary judgement is appropriate because no genuine issue of material fact exists for any of the remaining claims.

Earlier this week, Plaintiffs abandoned their claims against Defendant Jae Cha.  Summary judgment in favor of Mr. Cha could be granted for this reason alone.  But it must also be granted because there is no evidence Mr. Cha had anything to do with the events giving rise to this lawsuit.

Plaintiffs' claims against the other defendants fare no better.  For example, Plaintiffs' claim for fraudulent inducement was the only fraud-based claim to survive the Rule 12 stage.  At the time, the Court accepted as true Plaintiffs' allegation that the "defendants knew that they would ultimately oust plaintiffs 'one way or another' and concealed this intent to attain the needed capital investment from plaintiffs." *See* ECF No. 51 at 20-21.  Now, after both fact and expert discovery, Plaintiffs have no evidence whatsoever to support their claim.  On February 15, 2023, Magistrate Schwartz ordered Plaintiffs to address "factual issues" related to fraudulent inducement in their section of the PTO.  Despite this instruction, however, Plaintiffs added zero facts.  As it stands, the PTO does not include any factual contentions regarding pre-contract actions that speak to any of the elements of a fraudulent inducement claim under Delaware law.

Plaintiffs' claim for unjust enrichment fails as a matter of law because the Operating Agreement of Torch Research, LLC ("Operating Agreement") governs the relationship between the parties.  The only reason this claim survived Defendants' motion to dismiss in the first place was because, at the time, an issue existed as to whether the Operating Agreement governed Plaintiffs' relationships with all of the defendants.  That issue is no longer in dispute.  Summary judgment of no unjust enrichment is therefore appropriate.

Plaintiffs' remaining claims cannot be reconciled with the plain language of the Operating Agreement and Delaware law.  Plaintiffs cannot show a breach of contract by virtue of a "capital expenditure" or a "Transfer" in violation of Sections 4.11 and 5.4 of the Operating Agreement, respectively.  Consistent with Delaware law, the parties also expressly limited their fiduciary obligations in connection with financially interested transactions, such that no breach could occur on these facts.  Further, Defendant Weaver cannot conspire with himself to breach his fiduciary duties (or do anything else) under Delaware law.

Plaintiffs have not been shy about their contempt for Brian Weaver.  This case is more about personal animus and misdirected pride than anything else.  Plaintiffs have had a full and fair opportunity to conduct discovery for over a year and have little to show for it.  The current record confirms the vast majority of the allegations in the original Complaint were unfounded and downright wrong, including the baseless harassment and disparagement of Mr. Cha.  Defendants respectfully request that the Court enter summary judgment in their favor on all remaining claims.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS ("SOF")

### A.    The Parties

1.    The two members of Plaintiff Andes Capital Financing LLC ("Andes Capital") are Andres Ruzo and Aldo Figueroa.  *See* PTO § 1(a) (first paragraph); *see also* Ex. 2, Nov. 29, 2022 Deposition of Andres Ruzo ("Ruzo Dep.") at 66:1-3; Ex. 3, Nov. 28, 2022 Deposition of Aldo Figueroa ("Figueroa Dep.") at 41:1-6.

2.    Mr. Ruzo and Mr. Figueroa control Andes Capital.  *See* PTO at 16.

3.    The sole member of Coevolution LLC ("Coevolution") is Carlos Carpizo.  *See* PTO § 1(a)(first paragraph); *see also* Ex. 4, Nov. 28, 2022 Deposition of Carlos Carpizo ("Carpizo Dep.") at 15:12-16.

4.    Mr. Carpizo controls Coevolution.  *See* PTO at 16.

5.      The members of Defendant Crossed Keys LLC ("Crossed Keys") are trusts in the name of Defendant Brian Weaver and his wife, and from 2017 to the present, nobody other than Mr. Weaver or his wife (or their trusts) has had a vested membership interest in Crossed Keys. *See* Ex. 1, Mar. 17, 2023 Declaration of Brian Weaver ("Weaver Decl.") ¶ 3; *see also* PTO § 2(a)(16); Ex. 5, Jan. 6, 2023 Deposition of Brian Weaver ("Weaver Dep.") at 46:16-24.

6.      Defendant Jae Cha previously had an unvested potential membership interest in Crossed Keys, which never actually vested before it was terminated.  *See* Ex. 1, Weaver Decl. ¶ 4; *see also* Ex. 5, Weaver Dep. at 128:9-12, 131:10-132:11; Ex. 6, Jan. 12, 2023 Deposition of Jae Cha ("Cha Dep.") at 24:12-23.

7.      Mr. Cha did not participate in any of the alleged misconduct at issue in this case. *See* Ex. 6, Cha Dep. 105:8-106:7, 134:9-23; Ex. 5, Weaver Dep. at 104:13-25.

8.      On March 13, 2023, counsel for Defendants asked counsel for Plaintiffs whether Plaintiffs had "a good faith basis to oppose summary judgment" on "any claims against Jae Cha," to which Plaintiffs' counsel responded:  "Plaintiffs do not oppose the dismissal of all claims against Mr. Cha, because plaintiffs do not intend to pursue further claims against him."  *See* Ex. 26, Mar. 13-14, 2023 email chain between counsel re summary judgment in favor of Jae Cha.

9.      Mr. Weaver indirectly manages and controls Crossed Keys, through an entity called Prometheus Capital LLC, which is wholly owned and controlled by Mr. Weaver.  *See* Ex. 1, Weaver Decl. ¶ 5; *see also* Ex. 5, Weaver Dep. at 92:25-94:2, 96:6-8; 98:15-25.

10.     Crossed Keys, Andes Capital, and Coevolution executed the Operating Agreement on or about March 3, 2017.  *See* PTO § 2(a)(1); *see also* Ex. 7, Operating Agreement.  The parties have stipulated to the admissibility of the Operating Agreement.  *See* PTO § 2(b)(i).

11.     Torch is a Delaware limited liability company, formed under the Delaware Limited Liability Company Act (the "LLC Act").  *See* Ex. 7, Operating Agreement 1 (preamble).

B.       **The Negotiation and Execution of the Operating Agreement**

12.      When Mr. Weaver was negotiating with Plaintiffs regarding their investment in Torch, and for a time after the Operating Agreement was executed, he was optimistic that Plaintiffs' involvement in Torch would be beneficial in the long term for Torch, Plaintiffs, and Crossed Keys.  *See* Ex. 1, Weaver Decl. ¶¶ 6-8.

13.      In negotiating with Plaintiffs regarding their investment in Torch, Mr. Weaver did not intend at that time to enter into a merger eliminating Plaintiffs' interests in Torch.  *See* Ex. 1, Weaver Decl. ¶ 7.

14.      At the time they decided to invest in Torch, Plaintiffs viewed the transaction as a high-risk investment.  *See* Ex. 2, Ruzo Dep. 70:11-20, 75:2-76:6, 78:16-79:2; Ex. 3, Figueroa Dep. 50:4-51:1; Ex. 4, Carpizo Dep. 21:17-22:2.

15.      At the time they decided to invest in Torch, Plaintiffs did not plan, one way or the other, whether they would stay members of Torch for the duration of the company's existence. *See* Ex. 2, Ruzo Dep. 75:2-76:6; Ex. 4, Carpizo Dep. 64:16-65:10.

16.      The first draft of what would become the Operating Agreement was sent by Mr. Weaver to Mr. Ruzo on February 20, 2017.  *See* Ex. 8, TORCH00008632-70.[2]

17.      On February 21, 2017, Plaintiffs' deal counsel, Rick Dahlson at Jackson Walker LLP, sent Mr. Ruzo a memorandum summarizing the terms of the initial draft of the Torch operating agreement, which Mr. Ruzo then forwarded to Mr. Weaver.  *See* Ex. 9, ANDES003915-17 ("Attorney Summary").

18.      In the Attorney Summary, Mr. Dahlson told Plaintiffs that, under the initial draft of the Torch Operating Agreement: "You have no blocking rights for anything (67% of Share

---

[2] The parties have stipulated that Exhibits 8-17 are deemed authenticated and business records for hearsay purposes.  *See* PTO § 2(c).

interests required, which they have 90%), including any amendment to the Agreement." *See* Ex. 9, Attorney Summary § B(3).

19.     In the Attorney Summary, Mr. Dahlson described the anti-assignment provisions in Articles 5 and 10 as follows: "No transfer of Membership Interests without the consent of all Members.  Note:  This only stops you from selling as they can always amend the Agreement and sell their Membership Interests." *See* Ex. 9, Attorney Summary § B(4).

20.     On February 22, 2017, Mr. Weaver responded to certain proposed revisions to the draft operating agreement stating: "I do need to ensure rights such as being able to raise outside capital and selling the company are board decisions-------thus, we will move certain things like this into the 'Board activity' column, so the Board can do this----items like this can't require '100% member approval'.   Blocking a deal could be detrimental to the business."   *See* Ex. 10, ANDES005145-46 at -5145.

21.     On February 22, 2017, Mr. Ruzo emailed Mr. Figueroa and Mr. Carpizo, stating: "We are getting minority rights… trying BTW   :-)." *See* Ex. 10, ANDES005145 at -5145.

22.     In negotiations of the scope of minority rights, the parties agreed to pare back a list of six veto rights to the two rights that appeared in Section 4.11 of the final version of the Operating Agreement, as reflected in a redline prepared by Mr. Dahlson.  *See* Ex.11, ANDES001011-12; Ex. 12, ANDES001052-84 (attachment to Ex. 11, ANDES001011-12) at -1063-64.

23.     The executed Operating Agreement is an enforceable contract supported by sufficient consideration.  *See* PTO § 2(a)(2).

24.     The word "merger" does not appear in the Operating Agreement.  *See generally* Ex. 7, Operating Agreement.

25.     Upon executing the Operating Agreement, Andes Capital and Coevolution acquired Series A Preferred Membership Interests in Torch.  *See* Ex. 7, Operating Agreement § 1.1(u).

6

26.     As of March 3, 2017, 86.7% of the Series A Preferred Membership Interests in Torch belonged to Andes Capital and 13.3% of the Series A Preferred Membership Interests in Torch belonged to Coevolution.  *See* Ex. 7, Operating Agreement § 1.1(u), p. A-1.

27.     As of March 3, 2017, Crossed Keys acquired 100% of the Common Membership Interests in Torch.  *See* Ex. 7, Operating Agreement § 1.1(k).

28.     Neither Crossed Keys nor Mr. Weaver or Mr. Cha has ever held a Series A Preferred Membership Interest in Torch.  *See* Ex. 1, Weaver Decl. ¶ 18.

29.     The parties agreed Delaware law would govern their relationship.  *See* PTO § 1(e).

**C.     The 2020 Merger**

30.     On September 28, 2020, Mr. Weaver sent Andes Capital, Coevolution, and Crossed Keys a written "Notice of Meeting of Members in Connection with Proposed Merger," announcing that at the October 9, 2020 meeting, the members would discuss and vote on a proposed merger that would result in a cancellation of all of the Series A Membership Interests of Torch.  *See* Ex. 13, ANDES000188 ("Merger Notice").

31.     Crossed Keys attended the October 9, 2020 meeting of the members of Torch.  *See* Ex. 1, Weaver Decl. ¶ 13; Ex. 14, ANDES000220-41 ("Merger Minutes") at -220.

32.     Mr. Weaver sent the videoconference link to the October 9, 2020 meeting of Torch's members to Mr. Ruzo, Mr. Figueroa, and Mr. Carpizo, twice.  *See* Ex. 15, ANDES003060-89 at -3060.

33.     Neither Andes Capital nor Coevolution attended the October 9, 2020 meeting of Torch's members.  *See* Ex. 1, Weaver Decl. ¶ 13; Ex. 14, Merger Minutes ANDES000220.

34.     The vote of those members attending the October 9, 2020 meeting of the members of Torch was unanimous in favor of the proposed merger.  *See* Ex. 1, Weaver Decl. ¶ 14; Ex. 14, Merger Minutes at -220.

35.     On October 9, 2020, at 11:30 a.m. Eastern time, Torch Merger, LLC merged into Torch Research, LLC, with the surviving entity being Torch Research, LLC (the "2020 Merger"). *See* Ex. 16, ANDES000200-01 ("Certificate of Merger"); Ex. 17, ANDES003096-113 ("Merger Agreement") at § 1(a).

36.     In connection with the 2020 Merger, Defendants retained the services of two separate valuation firms, Objective Capital Partners ("Objective") and Cabrillo Advisors ("Cabrillo"), to provide valuations of Torch.   Ex. 1, Weaver Decl. ¶ 15; *see also* Ex. 18, ANDES000195-199 ("Merger Presentation") at 197-98.   The parties have stipulated to the admissibility of the Merger Presentation.  *See* PTO § 2(b)(v).

37.     Defendants retained the services of Objective and Cabrillo to ensure the 2020 Merger was fair to Plaintiffs and Torch.  *See* Ex. 1, Weaver Decl. ¶ 15; *see also* Ex. 5, Weaver Dep. at 303:6-304:10; Ex. 13, Merger Notice.

38.     Mr. Weaver did not intentionally undervalue Plaintiffs' interests in Torch in connection with the 2020 Merger.  *See* Ex. 1, Weaver Decl. ¶ 17; *see also* Ex. 5, Weaver Dep. at 303:6-304:1.

39.     Objective and Cabrillo performed independent valuations using different methodologies.  *See* Ex. 19, ANDES000131-186 ("Objective Valuation") at -149; Ex. 20, TORCH00015546-623 ("Cabrillo Valuation") at -1558-61; *see also* Ex. 21, Jan. 13, 2023 Deposition of Christian Tregilis ("Tregillis Dep.") at 237:19-238:15.  The parties have stipulated to the admissibility of the Objective Valuation and the Cabrillo Valuation.  PTO §§ 2(b)(ii)-(iii).

40.     Objective estimated the value of Torch as of July 31, 2020 to be between $5,900,000 and $7,200,000.  *See* Ex. 19, Objective Valuation at -134.

41.     Cabrillo estimated the value of Torch as of July 31, 2020 to be $6,768,000.  *See* Ex. 20, Cabrillo Valuation at -115547.

42.     Objective and Cabrillo's 2020 projections as to the future value of Torch have proven to be accurate approximations of the actual value of Torch today.  *See* Ex. 21, Tregillis Dep. at 230:3-231:1.

43.     Plaintiffs' damages expert did not perform any appraisal of Torch.  *See* Ex. 21, Tregillis Dep. at 44:13-16.

44.     The only two appraisals of Torch's value produced in this litigation are the Objective Valuation and the Cabrillo Valuation.  *See* Ex. 21, Tregillis Dep. at 237:19-25.

45.     The book value of Torch as of the 2020 Merger was $10,729,017.  *See* Ex. 22, Mar. 17, 2023 Declaration of David E. Yurkerwich ¶¶ 5-6.

46.     In connection with the 2020 Merger, the Series A Preferred Membership Interests in Torch were converted into the right to receive an aggregate amount equal to $1,354,248 in the form of promissory notes, and any unconverted Series A Preferred Membership Interests in Torch were cancelled.  *See* Ex. 17, Merger Agreement § 4(a).

47.     On October 9, 2020, after the Certificate of Merger was filed, Andes Capital and Coevolution received the promissory notes totaling $1,354,248 described in the Merger Agreement.  *See* PTO § 2(a)(17); *see also* Ex. 17, Merger Agreement § 4(a).

48.     After the promissory notes were issued, Torch issued checks to Andes Capital and Coevolution in satisfaction of the promissory notes.  Ex 4, Carpizo Dep. 68:25-70:11.

49.     Plaintiffs chose not to cash the checks they received as a result of the merger.  *See* PTO § 2(a)(20).

**D.     WestCap's Investment in Torch**

50.     During the time Plaintiffs were members of Torch, Mr. Weaver personally guaranteed loans and borrowed money to fund Torch's operations.  *See* Ex. 1, Weaver Decl. ¶ 9.

51.     During the time Plaintiffs were members of Torch, Torch requested that Plaintiffs also provide additional capital to ensure Torch's continued operations, but Plaintiffs denied those requests.  *See* Ex. 1, Weaver Decl. ¶ 9.

52.     Starting in May 2020, WestCap Management, LLC and certain of its affiliates (collectively, "WestCap") entered into a series of agreements in which WestCap agreed to invest $30 million in Torch, in exchange for a 30% post-closing ownership in Torch, including two term sheets dated May 19, 2020 and an October 7, 2020 letter agreement.  *See* PTO §§ 2(a)(10)-(13).

53.     One of the terms of the October 7, 2020 WestCap letter agreement was that Mr. Weaver agreed to merge Torch, such that Torch would be owned 100% by one or more affiliates of Mr. Weaver within 30 days.  *See* PTO § 2(a)(15).

54.     The capital provided as a result of WestCap's investment was necessary to ensure Torch could continue to operate after 2020.  *See* Ex. 1, Weaver Decl. ¶ 11.

**E.     Plaintiffs' Failure to Identify Bases for Fraudulent Inducement Claim**

55.     On February 3, 2023, Plaintiffs' counsel sent U.S. Magistrate Judge Rachel E. Schwartz a draft PTO that asserted the following claim: "Defendants fraudulently induced plaintiffs into investing in Torch while knowing that defendants would later oust them from the company.  (Count V)."  *See* Ex. 23, Feb. 3, 2023 email from Terrence J. Campbell, with attached draft PTO (the "First Draft PTO") at § 4(a)(v).

56.     Also in the First Draft PTO, Defendants raised the following defense: "Plaintiffs' fraudulent inducement claims fail because there is no evidence to support Plaintiffs' contention that Defendants induced plaintiffs into investing in Torch while knowing that Defendants would later oust them from the company."  *See* Ex. 23, First Draft PTO at § 4(b)(x).

57.     On February 15, 2023, the Court provided comments on the First Draft PTO and instructed the parties to revise the PTO no later than February 22, 2023.  *See* Ex. 24, Feb. 15, 2023

email from Court, with attached comments to First Draft PTO (the "Comments on First Draft PTO").

58.     In response to Plaintiff's claim for fraudulent inducement, the Court stated: "Plaintiffs, your factual contentions section must allege sufficient facts to support each element of each claim.  Judge Vratil's order on Defendants' motion to dismiss provides more context as to how Plaintiffs originally stated this claim, but if Plaintiffs are still proceeding on this claim, it must be adequately supported in the factual contentions section." *See* Ex. 24, Comments on First Draft PTO at § 4(a)(v).

59.     In response to Defendants' defense that there is no evidence supporting the claim for fraudulent inducement, the Court stated: "Plaintiffs, please address these factual issues in your section." *See* Ex. 24, Comments on First Draft PTO at § 4(b)(x).

60.     Prior to the February 22, 2013 submission of the second draft of the PTO, counsel for Defendants made the following inquiry of Plaintiffs' counsel:

> "It does not look like Plaintiffs have yet responded to the following comments from the Court:
>
> a.     In Section 4(a)(v):  Plaintiffs, your factual contentions section must allege sufficient facts to support each element of each claim.  Judge Vratil's order on Defendants' motion to dismiss provides more context as to how Plaintiffs originally stated this claim, but if Plaintiffs are still proceeding on this claim, it must be adequately supported in the factual contentions section.
>
> b.     In Section 4(b)(x):  Plaintiffs, please address these factual issues in your section.

"Do you plan on addressing those comments before this goes back to the Court?"

Plaintiffs' counsel responded: "Plaintiffs addressed the Court's comments and do not intend on adding anything else." *See* Ex. 25, Feb. 22, 2023 email chain between counsel re second draft of PTO.[3]

---

[3] The cell phone number of Plaintiffs' counsel has been redacted from Exhibit 25.

61.     Notwithstanding the Court's instruction, Defendants' reminder, and Plaintiffs' representation, Plaintiffs failed to add any factual support in the PTO for their fraudulent inducement claim. *Compare* PTO § 3(a) (Plaintiffs' Factual Contentions) *with* Ex. 23, First Draft PTO at § 3(a) (same).

## III.     ARGUMENT IN SUPPORT OF SUMMARY JUDGMENT[4]

### A.     Generally Applicable Legal Principles

#### 1.     The Delaware Limited Liability Company Act

Defendant Crossed Keys and Plaintiffs Andes and Coevolution formed Torch as a Delaware LLC, subject to Delaware law. SOFs 10, 11, 29. Delaware LLCs are governed by Delaware's Limited Liability Company Act, which sets out a series of clear rules for those entities. *See* 6 Del. C. § 18-101 et seq. The parties may generally contract around the statutory rules. 6 Del. C. § 18-1101(b). But "[w]here an LLC agreement fails to address a certain issue, Delaware's Limited Liability Company Act (the 'LLC Act') provides default rules." *Grove v. Brown*, No. 6793-VCG, 2013 WL 4041495, at *5 (Del. Ch. Aug. 8, 2013).

#### 2.     Delaware Law Permits Mergers Over Minority Dissent, Absent a Contractual Agreement to the Contrary

The most relevant statutory "default rule" in this action is the "highly majority-favoring default rule provided by Delaware's merger provision," Section 209 of the LLC Act, "which allows the majority to kick out the minority." Franklin A. Gevurtz, *Why Delaware LLCs?*, 91 Or. L. Rev. 57, 121 (2012) (citing 6 Del. C. § 18-209(b)).

Under the LLC Act, a limited liability company "may merge or consolidate with or into" another LLC or other business entity, so long as the merger is approved by "members who own

---

[4] If the Court determines that it has subject-matter jurisdiction over Torch Research, LLC, the following arguments are equally applicable as to that defendant and summary judgment should be entered in Torch's favor.

more than 50 percent" of the LLC.  6 Del. C. § 18-209(b).  In a Delaware merger, ownership interests in the LLC may be "exchanged for or converted into cash [or other] property" or may be entirely "cancelled."  6 Del. C. § 18-209(b).  The practical effect of this law is that majority members of a Delaware LLC are authorized "to seize it for themselves," so long as they own more than 50% of the interests.  *Grove*, 2013 WL 4041495 at *7 (citing 6 Del. C. 18-209(b)); *see also McClure v. Leafe*, No. 17-13106, 2018 WL 4637339, at *2 (E.D. Mich. Sept. 27, 2018) ("The merger eliminated Plaintiff's interest, converting it into cash, as permitted by 6 Del. C. § 18-209(b).").

If the members of an LLC do not wish to provide a majority owner with the right to unilaterally merge the minority out of the company, it is incumbent on them to include a provision in the governing agreement "that a domestic limited liability company shall not have the power to merge or consolidate as set forth" in the LLC Act.  6 Del. C. § 18-209(h) (emphasis added).  But when a Delaware LLC's "Operating Agreement is silent as to how the Company may merge," the LLC Act "provides the default mechanism for merger"—namely, approval by "members who own more than 50 percent of the then current percentage."  *Grove*, 2013 WL 4041495 at *7 (quoting 6 Del. C. 18-209(b)) (emphasis omitted); *see also McClure*, 2018 WL 4637339 at *4 (requiring "Operating Agreement [to] contain language that either dictates the exact voting requirements for a merger's approval or prohibits it" in order to replace default statutory rule).

### 3.   Delaware Principles of Contract Interpretation

Because the 2020 Merger was legal under the LLC Act, Plaintiffs argue that two provisions in the Operating Agreement replaced the default rule with a contractual prohibition on mergers.[5]

---

[5] Plaintiffs originally "allege[d] five breach of contract claims under the operating agreement." ECF No. 51 (MTD Order) at 7.  However, the Court granted Defendants' motion to dismiss three of those claims, leaving only the claims under Sections 4.11 and 5.4.  *Id.* at 22.

The Operating Agreement does not actually use the word "merger," SOF 24, so the Court must interpret the contract to determine whether a prohibition on mergers was silently intended.

"The construction of a contract is a question of law." *Orderly Health, Inc. v. NewWave Telecom & Techs., Inc.*, No. 20-1441, 2021 WL 4592268, at *2 (10th Cir. Oct. 6, 2021). "[W]hen a court interprets a contract, as a general matter it applies the law that the parties selected in their contract." *Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 427 (10th Cir. 2006). Thus, Delaware law governs the interpretation of the Operating Agreement. SOF 29; *see also* PTO § 1(e).

"Under Delaware law, contract interpretation begins with the agreement's text. When the contract is clear and unambiguous, Delaware courts will give effect to the plain-meaning [sic] of the contract's terms and provisions, without resort to extrinsic evidence." *Accident Ins. Co., Inc. v. U.S. Bank Nat'l Ass'n*, No. 21-1504, 2022 WL 3713512, at *5 (4th Cir. Aug. 29, 2022) (cleaned up). "Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract." *Id.* (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006)). Specifically, both Delaware courts and federal courts applying Delaware law routinely determine the "plain meaning" of contractual phrases by reference to how they are "defined by Black's Law [Dictionary]." *McGinnis Commercial Real Estate Co. v. Jankes*, No. CPU5-14-000701, 2016 WL 1221427, at *2-3 (Del. Ct. Common Pleas Mar. 29, 2016).[6]

Only if a court determines a contract clause is ambiguous does the court "resort to extrinsic evidence to determine the parties' contractual intent." *Sunline Commercial Carriers, Inc. v.*

---

[6] *See also Accident Ins. Co., Inc.*, 2022 WL 3713512 at *5; *Peterson v. AWJ Global Sustainable Fund, LP*, No. 15-cv-00650, 2015 WL 5921225, at *3 (C.D. Cal. Oct. 11, 2015); *Vitalink Pharmacy Servs., Inc. v. Grancare, Inc.*, No. 15744, 1997 WL 458494, at *7 (Del. Ch. Aug. 7, 1987); *cf. Rehoboth Bay Homeowners' Ass'n v. Hometown Rehoboth Bay, LLC*, 252 A.3d 434, 442 (Del. 2021) (determining ordinary meaning of statutory phrase by reference to Black's Law definition).

*CITGO Petroleum Corp.*, 206 A.3d 836, 846-47 (Del. 2019) (cleaned up).  If there is a genuine issue of material fact as to the extrinsic evidence, a jury may be needed to resolve the ambiguity. *Id.* at 849.  If, on the other hand, "the evidence of record points in one direction, it can serve to conclusively resolve the ambiguity in one party's favor."  *Jordan v. Mirra*, No. 14-cv-1485, 2022 WL 610713, at *9 (D. Del. Feb. 22, 2022) (cleaned up) (granting summary judgment notwithstanding potential ambiguity in contract).

### B. Defendants Are Entitled to Summary Judgment as to the Claimed Breach of Section 4.11(b)(i) of the Operating Agreement (re "Capital Expenditures")

The Operating Agreement did not expressly prohibit or restrict Defendants' ability to effect the 2020 Merger.  The word "merger" does not appear anywhere in the agreement.  SOF 24. Instead, Plaintiffs contend that Defendants breached the Operating Agreement when Defendants attempted to pay Plaintiffs for their former interests in Torch after the merger.  *See* ECF No. 51 (MTD Order) at 10-11 (describing claim).  Defendants are entitled to summary judgment on this claim for four reasons.

First, Section 4.11 required a unanimous affirmative vote of the members to make "capital expenditures" in excess of $50,000.  PTO § 2(a)(2)(iv).  But the payment Defendants provided was not a capital expenditure, under the ordinary meaning of that term.

Second, there is no extrinsic evidence demonstrating the parties intended Section 4.11(a) to prohibit mergers.  To the contrary, the parties expressly acknowledged in negotiating the Operating Agreement that Plaintiffs' veto rights would be limited to those expressly stated in Section 4.11, with Defendants retaining control over issues related to ownership of the company.

Third, no expenditure ("capital" or otherwise) was made to compensate Plaintiffs for their prior interests during the time Plaintiffs had membership interests in Torch.

Fourth, the "expenditure" challenged by Plaintiffs did not actually harm them.

15

1.   <u>Paying Plaintiffs for their cancelled shares is not a "capital expenditure," under the ordinary meaning of that phrase.</u>

Because the phrase "capital expenditure" is not defined in the Operating Agreement, the Court should "look to dictionaries for assistance in determining [its] plain meaning." *Lorillard Tobacco*, 903 A.2d at 738 (Del. 2006). The Delaware Supreme Court looks to Black's Law Dictionary for the "ordinarily accepted meaning" of the phrase "capital expenditure," which "is defined as an outlay of funds to acquire or improve a fixed asset." *Rehoboth Bay Homeowners*, 252 A.3d at 442 (quoting Black's Law Dictionary, capital expenditure (11th ed. 2019)) (cleaned up). A "fixed asset," in turn, is a "long-term asset used in the operation of a business or used to produce goods or services, such as equipment, land, or an industrial plant." Black's Law Dictionary, asset, capital asset ("Also termed *fixed asset*") (11th ed. 2019)).

Plaintiffs have suggested that, rather than looking to the plain meaning of "capital expenditure," the Court should interpret the phrase based on tax law under the Internal Revenue Code. But the Delaware Supreme Court has expressly rejected the notion that the "ordinarily accepted meaning" of "capital expenditure" is supplanted by the byzantine rules of the tax code:

> The Appellants urge us to look to regulations promulgated under the Internal Revenue Code as the exclusive source for determining what is a capital improvement. We decline to do so. The Act directs us to look to the ordinarily accepted meaning, which may or may not correspond to a definition contained in an unrelated statute or regulation.

*Rehoboth Bay Homeowners*, 252 A.3d at 442; *cf. Star Cellular Tel. Co., Inc. v. Baton Rouge CGSA, Inc.*, No. 12507, 1993 WL 294847, at * 8 (Del. Ch. Ct. Aug. 2, 1993) (refusing to apply regulatory principles where nothing in contract "persuasively establishes that the parties intended to define [the term] by reference to the federal regulatory concept").

Not only is the Internal Revenue Code entirely unrelated to the dispute in this case, but it also defines the adjective "capital" in a manner much broader than the ordinary meaning. Black's

Law Dictionary is again instructive.  It includes two definitions of capital assets—the common definition above and a special definition "[f]or income-tax purposes" only.  Black's Law Dictionary, asset, capital asset (11th ed. 2019)).  In the niche area of tax law, a "capital" expense includes all expenses other than those specifically excluded by statute.  *Id.*  This expansive, technical definition is anything but the "plain meaning" of a capital expense.[7]

According to the plain language of the Operating Agreement, Plaintiffs' consent was required before buying a building or an expensive piece of equipment.  *See, e.g.*, PTO at 17 (alleging Mr. Weaver requested permission to lease a jet).  But Section 4.11 says nothing about issuing payment for eliminated membership interests.  Absent such a prohibition, the 2020 Merger was perfectly legal.  *See McClure*, 2018 WL 4637339 at *4 (where the "Operating Agreement does not contain language that either dictates the exact voting requirements for a merger's approval or prohibits it," the LLC merger is "lawfully" effected "upon approval of its voting members").

    2. <u>Extrinsic evidence further confirms that the right to veto "capital expenditures" was not intended to block transactions regarding Torch's ownership.</u>

To the extent the Court concludes that the Internal Revenue Code renders the term "capital expenditure" ambiguous, then the Court "must resort to extrinsic evidence to determine the parties'

---

[7] In ruling on Defendants' motion to dismiss, the Court looked to cases analyzing whether expenses were capital expenditures for tax purposes, rather than the definition provided by Black's Law Dictionary.  *See* ECF No. 51 (MTD Order) at 10-11.  The Court did so because Defendants did "not cite any authority" contrary to the tax law interpretation, "[o]ther than a case from the Eastern District of Virginia which merely provides the Black's Law Dictionary definition."  *Id.* at 11 n.2.  Plaintiffs did not identify a claim based on an alleged breach of Section 4.11 in the Complaint.  *See* ECF No. 1 (Compl.) at ¶¶ 45-52 (pleading only breaches of Section 7.2 and 16.11).  Plaintiffs raised Section 4.11 for the first time in opposing the motion to dismiss.  *See* ECF No. 35 at 15-16.  In addressing this new allegation on reply, Defendants did not provide the Court with the authority (now cited in this brief) holding (a) Delaware courts rely on Black's Law Dictionary, including for the plain meaning of "capital expenditures," and (b) that tax law does not provide the ordinary meaning of that phrase.  With the benefit of additional time, Defendants became aware of this authority and provides it now.

contractual intent." *Sunline*, 206 A.3d at 846-47.  There is no extrinsic evidence suggesting the parties intended this provision to provide Plaintiffs with the right to block a merger.

To the contrary, communications documenting the parties' negotiation of the agreement show the parties carefully bargained for a narrow set of specific minority veto.

- On February 20, 2017, Mr. Weaver sent Mr. Ruzo of Andes Capital the initial draft of the Operating Agreement.  SOF 16.

- On February 21, 2017, Plaintiffs' deal counsel observed that the initial draft provided Plaintiffs with "no blocking rights for anything."  SOFs 17, 18.

- Mr. Ruzo emailed the other principals of Plaintiffs and said that he was "trying" to "get[] minority rights" for them added to the contract.  SOF 21.

- In negotiating the scope of such minority rights, Mr. Weaver made it clear Defendants would not agree to a contract that would "require '100% member approval'" on Defendants' ability to either sell the company or bring new investors into the company. SOF 20.  The Operating Agreement, he explained, must not give Plaintiffs an opportunity to "block[] a deal" in a manner that was "detrimental to the business."  *Id.*

- After further negotiation, the initial list of six veto rights was reduced to just the two that ended up in Section 4.11 of the final, executed Operating Agreement.  SOF 22.

No evidence exists suggesting that the parties ever even considered providing Plaintiffs with the right to veto a merger, much less that they intended to include such a provision in the Operating Agreement.  Such a notion would be inconsistent with the parties' intention that Defendants retained the rights to sell Torch completely or to reduce the value of Plaintiffs' membership interests by accepting new investors.  *See* SOF 20.

This negotiated deal point was formalized in Section 4.1 of the Operating Agreement, which gave the Board of Managers (of which Defendants controlled 60%) discretion over Torch,

its operations, and its strategic path—limited only by the two veto provisions "<u>specifically</u> reserved under Section 4.11." *See* Ex. 7, Operating Agreement § 4.1 (emphasis added).  Plaintiffs' position cannot be harmonized with these provisions.

The Operating Agreement must "be read as a whole."  *Sunline*, 206 A.3d at 846-47.  Here, the uncontroverted evidence is that, when read as a whole, the Operating Agreement did not guarantee Plaintiffs' membership interests in perpetuity.

> 3.  <u>Plaintiffs had no right to veto the expenditure of Torch funds after Plaintiffs were no longer members of Torch.</u>

Before making a capital expenditure over $50,000, Torch was only required to obtain the "affirmative vote of Members holding all of the Share Interests."  PTO § 2(a)(2)(iv).  Even if Torch's payment to Plaintiffs for their eliminated interests could be considered "capital" in nature, because Plaintiffs did not hold any equity at the time of the expenditure, Plaintiffs had no right to vote against the payment.

The term "expenditure" is not defined by the Operating Agreement.  The ordinary meaning of "expenditure" is the "act or process of spending or using money, time, energy, etc.; especially the disbursement of funds."  Black's Law Dictionary, expenditure (11th ed. 2019)).  No money was paid to Plaintiffs until after the merger.  SOFs 47, 48.  Indeed, no "disbursement of funds" was ever made because Plaintiffs refused to cash their checks.  SOF 49.

This timing is not a mere technicality.  The fact that there was no expenditure before the merger was completed was a substantive grievance Plaintiffs articulated in their Complaint— something they called "putting icing on [the] stolen cake:"

> And to add insult to injury, Defendants did not even attempt to pay Plaintiffs for Plaintiffs' grossly undervalued membership interests. Rather, Defendants flauntingly decided that they would pay the purchase price at a later time. Indeed, in what amounts to "putting icing on their stolen cake," Defendants executed two separate promissory notes (one for each Plaintiff)

providing that Defendants did not have to pay the purchase price until October 9, 2021—one full year after the date of the squeeze-out merger.

ECF No. 1 (Compl.) at ¶ 41.

Because the relevant "expenditures" were not "made" before Plaintiffs were merged out of Torch, Plaintiffs have no claim for breach of Section 4.11.

4.     <u>Plaintiffs were not harmed by the alleged expenditure.</u>

An element of a breach of contract claim under Delaware law is "resulting damage to the plaintiff." *Riverside Risk Advisors LLC v. Chao*, No. 2019-0789-KSJM, 2022 WL 14672745, at *22 (Del. Ch. Oct. 26, 2022). Plaintiffs could not possibly have been harmed by the allegedly unauthorized expenditure because they were the recipients of that payment. Absent injury, any breach of contract claim is not actionable.

Absent unanimous consent, Section 4.11 limits the <u>amount</u> that can be spent on capital transactions; it does not <u>prohibit</u> those transactions. It is a spending cap to make sure all members have a say on large purchases, before Torch spends the money. The absurdity of Plaintiffs' argument lies in the fact that, if Defendants had only paid Plaintiffs a combined total of $49,999 for their shares—or simply refused to pay for the shares altogether—Section 4.11 undoubtedly would not apply to the 2020 Merger. It is only because Defendants tried to pay Plaintiffs an additional $1.3 million beyond the spending cap that Plaintiffs allege a breach of contract. But Plaintiffs were not injured by receiving <u>more</u> money.

Stripped of Plaintiffs' semantic contortions, what Plaintiffs are attempting to do is transform Sections 4.11's spending cap into a categorical right to veto mergers. But that is not the intended function of Section 4.11. In the event Defendants paid Plaintiffs more than they were allowed under the Operating Agreement, it was to Plaintiffs' benefit, not their injury.

**C.      Defendants Are Entitled to Summary Judgment as to the Claimed Breach of Section 5.4 of the Operating Agreement (re "Transfers" of Interests)**

The other provision Plaintiffs try to redefine as a prohibition on mergers is Section 5.4 of the Operating Agreement.  *See* PTO at 16.  That clause prohibits the transfer of ownership interests "without the unanimous written consent of the other Members of the Company."  PTO § 2(a)(2)(vi).  Nothing in this anti-assignment clause prohibits a merger of Torch or the related elimination of Plaintiffs' membership interests.  *Cf.* 6 Del. C. § 18-209(b) (allowing membership interests to be "converted into cash [or other] property" or "cancelled" in a merger).

Plaintiffs nevertheless contend this was the intended meaning of the anti-assignment clause and that Defendants breached that clause when they effected the merger.  This contention does not accurately reflect the meaning of the anti-assignment clause or the factual nature of the merger transaction.  Because the merger did not violate Section 5.4, Defendants are entitled to summary judgment on this claim as well.

1.      <u>The Operating Agreement restrictions on transfers are inapplicable.</u>

"Anti[-]assignment clauses," like the one in the Torch Operating Agreement, "are normally included in contracts to prevent the introduction of a stranger into the contracting parties' relationship and to assure performance by the original contracting parties."  *Star Cellular*, 1993 WL 294847 at * 8.  Likewise, Section 5.4 prevents a member from transferring its own interest in Torch to a third party, without the unanimous consent of the <u>other members</u> in Torch.  PTO § 2(a)(2)(vi).

The relevant clause in Section 5.4 states: "the Share Interests of a Member in the Company may not be Transferred or assigned in any manner voluntarily or involuntarily without the unanimous written consent of the other Members of the Company."  *Id.*  Because this clause starts in the passive voice—"may not be Transferred or assigned"—Plaintiffs argue that it prohibits one

member (like Crossed Keys) from "transferring" another member's interests (like those of Andes Capital and Coevolution).  But two other provisions in Section 5.4 clarify the true intent of the parties: a member may not transfer its own interests without the consent of the other members.

First, Section 5.4 states "the Transfer of Share Interests shall be governed by Article 8 of the Delaware Uniform Commercial Code." PTO § 2(a)(2)(vi); *see* 6 Del. C. §§ 8-101 *et seq.*  There are no provisions in that statute relevant in any way to the elimination of interests as a result of a merger of the underlying asset.  To the contrary, Article 8 of the UCC deals extensively with "transfers" in the ordinary sense, when the owner of the security sells or gifts it to another person. *See, e.g.* 6 Del. C. §§ 8-301 *et seq.* ("Transfer of Certified and Uncertified Securities").  Not only is Article 8 inapplicable to the sort of transfer alleged by Plaintiffs, the provisions governing transfers are incompatible with Plaintiffs' interpretation of the contract.  For example, Section 8-302 of the Delaware UCC states that the transferee of a membership security "acquires all rights in the security that the transferor had or had power to transfer." 6 Del. C. § 8-302.  This provision only makes sense if the contemplated "transferor" was the previous owner of the security, *i.e.*, the one with the "rights in the security."

Second, the "Transfer" of one member's interests needs to be approved by "the other Members of the Company" under the Operating Agreement.  PTO § 2(a)(2)(vi).  This provision makes perfect sense if Member A is transferring its own interests; Member B and Member C would need to approve that transfer.  But the provision is nonsensical if Member A is "transferring" the interests of Members B and C.  In that case, the only "other Member," whose interests are not being transferred, is the one doing the transfer.  Even if Section 5.4 of the Operating Agreement somehow applied to the so-called "Transfer" of Andes Capital's and Coevolution's interests, that "Transfer" was done with "the unanimous written consent of the [only] other Member[] of the Company," Crossed Keys.  *See* SOFs 31, 34.

Beyond Section 5.4, other provisions of the Operating Agreement confirm the parties' intention that a "Transfer" be given its usual meaning of a member disposing of its own membership interests.  For example:

- Even in an unapproved transfer, "the Transferee shall be entitled to receive the share of profits or income and any liquidating distribution or return of capital to which the Transferring Member would otherwise be entitled."  PTO § 2(a)(2)(vii).  This provision presupposes that the "Transferring Member" is the one who previously held the right to such distributions and return of capital—*i.e.*, that the "Transferring Member" would be transferring its own membership interests, not those belonging to someone else.  It also presupposes the Transferring Member and the "Transferee" are not the same entity.

- The "consequences of wrongful transfer" by operation of law only apply when the transferring member is "deemed to have Transferred <u>his</u> Share Interest."  PTO § 2(a)(2)(viii) (emphasis added).  Again, this language contemplates that the member doing the "transferring" is the member whose interests are being transferred.

- Article 10 of the Operating Agreement, "Restriction on Transfer," deals more specifically and in greater detail with the topic than Section 5.4.  There, the parties again clarified what was intended: "A Member may not transfer <u>his</u> Membership Interest[8] except as herein provided without the prior written consent of the Company and the other Members."  Ex. 7, Operating Agreement § 10.1 (emphasis added).

Every "contract must be read as a whole and in a manner that will avoid any internal inconsistencies, if possible."  *Bank of N.Y. Mellon v. Commerzbank Cap. Funding Trust II*, 65

---

[8] There is no meaningful difference between "Share Interest" as used in Section 5.4 and "Membership Interest" as used in Section 10.1.  The Operating Agreement defines "Share Interest" to mean "a unit of Membership Interest."  PTO § 2(a)(2)(i)(1).

A.3d 539, 550 (Del. 2013).  When taken together and read as a whole, the purpose of the anti-assignment provisions is clear—the LLC members were prohibited from passing their interests on to a stranger, without unanimous approval of the other members already in the company.  Section 5.4 was not intended to function as a covert anti-merger provision.

2. The anti-assignment clause applies to some mergers, but not the 2020 Merger.

The word "Transfer" is defined in the Operating Agreement to include "the passage of any such interest by . . . other operation of law."  PTO § 2(a)(2)(i)(2).  As the Court correctly observed in ruling on Defendants' motion to dismiss, the inclusion of the phrase "by operation of law" in an anti-assignment clause can be interpreted to include assignments that take the form of a merger.  ECF No. 51 (MTD Order) at 11-12 (citing *MTA Canada Royalty Corp. v. Compania Minera Pangea, S.A. de C.V.*, No. CV N19C-11-228 AML, 2020 WL 5554161, at *5 (Del. Super. Ct. Sept. 16, 2020)).  This is consistent with the purpose of the anti-assignment provision—that is, to prevent one member from forcing the others to do business with a stranger who may not honor their commitments.  *See Star Cellular*, 1993 WL 294847 at * 8.[9]

For example, Coevolution was prevented from selling its membership interests in Torch to a new company.  And because "Transfer" was defined to include transfers by "operation of law," Coevolution could not sidestep the prohibition on selling its interests by instead merging itself into some other company.  In other words, a party to an unassignable contract cannot "assign" its rights under the contract to a third party through a merger.  This is the fact pattern at issue in the various Delaware cases applying an anti-assignment clause to a merger, including the *MTA Canada*

---

[9] *See also AIG Retirement Servs., Inc. v. Altus Finance S.A.*, No. 05-cv-1035, 2011 WL 13213601, at *5 (C.D. Cal. Aug. 26, 2011) ("In addition, because 'anti[-]assignment clauses are normally included in contracts to prevent the introduction of a stranger into the contracting parties' relationship,' it is clear that the parties intended the anti-assignment language . . . to only apply to those who do not qualify as parties to the Stockholder Agreement.") (quoting *Star Cellular*, 1993 WL 294847 at *8).

*Royalty* company cited in the Court's Motion to Dismiss Order.  *See MTA Canada Royalty*, 2020 WL 5554161 at *5.  This is also why Delaware courts refuse to apply anti-assignment clauses where—as here—the entity surviving a merger was already a party to the contract.[10]  *See id.* at *4 (citing *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62 (Del. Ch. Ct. 2013).

Defendants are aware of no case applying such a provision to a merger of the underlying company owned by the members of an LLC.  The anti-assignment provision is concerned with mergers of the LLC's members, not a merger of the LLC itself.  Section 5.4 does not apply here.

3.   Plaintiffs' deal counsel confirmed the ordinary meaning of the transfer restrictions.

Because the term "Transfer" unambiguously refers to a member's disposition of its own interests, the Court need not consider extrinsic evidence from the parties' negotiation of the Operating Agreement.  *See Jordan*, 2022 WL 61071, at *7 (Delaware "[c]ourts consider extrinsic evidence to interpret the agreement only if there is an ambiguity in the contract").  But even if the Court considered such evidence, summary judgment would still be appropriate because there is no extrinsic evidence supporting Plaintiffs' interpretation.  *See id.* at *9 (granting summary judgment "where the evidence of record points in one direction" and thus "can serve to conclusively resolve the ambiguity in one party's favor") (cleaned up).

Defendants are aware of no evidence suggesting the parties included Section 5.4 in the Operating Agreement to prevent the elimination of ownership by merger.  To the contrary, Plaintiffs' deal counsel sent a memo to his clients (which Mr. Ruzo then shared with Defendants) interpreting the anti-assignment provisions purely in terms of the sale of membership interests, *e.g.*, it "only stops [Plaintiffs] from selling" their membership interests.  SOFs 17, 19.  This

---

[10] Torch Merger, LLC merged into Torch Research, LLC, with Torch Research, LLC continuing as the surviving entity.  SOF 35.

extrinsic evidence—and the absence of contradictory evidence—further supports application of the ordinary, common understanding of what sort of transfers are barred by an anti-assignment clause.

       4.    <u>No interests were transferred as a result of the merger.</u>

Even if the taking of minority interests amounted to a "Transfer" under the Operating Agreement, Defendants are still entitled to summary judgment because they did not take any of Plaintiffs' interests.  The Series A Preferred Membership Interests that Plaintiffs owned were eliminated by the merger, so that there was nothing to "transfer."  Because Plaintiffs' Preferred Membership Interests did not pass from Plaintiffs to Defendants, but rather ceased to exist, Section 5.4 was not breached in the merger.

The word "Transfer" is defined in the Operating Agreement to include 15 different ways that ownership interests can be "transferred"—some voluntary, like "a sale" or "gift," and some involuntary, like "foreclosure," "garnishment," or "intestate succession."  PTO § 2(a)(2)(i)(2).  But each and every form of "transfer" involves the "passage" of property from one person to another. *Id.*  The 2020 Merger did not involve the "passage" of Plaintiffs' shares to Defendants.

Plaintiffs' minority ownership in Torch consisted of preferred shares in the company, which were defined in the Operating Agreement as "Series A Preferred Membership Interests." SOF 25.  Series A Preferred shares were substantively distinct from the "Common Membership Interests" in Torch and were treated differently in the Operating Agreement.  *See, e.g.*, Ex. 7, Operating Agreement §§ 4.13 (option to sell in financing), 8.1 (preference in distributions).

Plaintiff Andes Capital owned 86.7% of the Series A Preferred shares, and Plaintiff Coevolution owned the other 13.3%.  SOF 26.  Neither Crossed Keys, nor any other Defendant owned any Series A Preferred shares.  *Id.*  Instead, Crossed Keys owned 100% of the "Common Membership Interests" in Torch.  SOF 27.

In the 2020 Merger, the "Series A Preferred Membership Interests [were] converted into the right to receive an aggregate amount equal to $1,354,248 in the form of a promissory note." SOF 46.  When shares in a merging LLC are "converted into cash, property, [or] rights" under the merger provisions of the LLC Act, *see* 6 Del. C. 18-209(b), that "equity interest" is "eliminate[d]"—*i.e.*, it ceases to be.  *Dawson v. Pittco Capital Partners, L.P.*, No. 3148-VCN, 2012 WL 1564805, at *17 (Del. Ch. Apr. 30, 2012); *cf. Rothschild Int'l Corp. v. Liggett Grp., Inc.*, 463 A.2d 642, 646 (Del. Ch. 1983), aff'd, 474 A.2d 133 (Del. 1984) ("Moreover, it has been held that preference rights of preferred stock can be eliminated legally through the merger process."). Something that no longer exists cannot "pass" from one person to another.

Defendants did not buy or otherwise transfer Plaintiffs' Series A Preferred shares to themselves.  To the contrary, no Series A Preferred shares existed after the 2020 Merger.  SOF 46.  To this day, neither Crossed Keys, nor Mr. Weaver has ever held Series A Preferred Membership Interests in Torch.  SOF 28.  Visually, the 2020 Merger functioned as shown in the top portion of the diagram below; the Preferred shares were eliminated, not transferred.



It is true that, as a result of the merger, Crossed Keys went from owning 90% of Torch to being the sole owner of Torch. But it did not do so through a transfer of Plaintiffs' Series A Preferred shares. Crossed Keys became the sole owner because it had always been the sole owner of the Common Membership Interests in Torch, and those were the only interests remaining after the Merger. SOF 46. While in both scenarios shown in the diagram, Crossed Keys would end up with all of the remaining shares in Torch, there is <u>no evidence</u> the 2020 Merger resulted in a transfer of the Preferred Interests (as depicted in the counterfactual scenario at the bottom of the diagram).

5.   <u>Even if Crossed Keys succeeded to Plaintiffs' Preferred Membership<br>Interests, Plaintiffs were not injured by the breach of contract.</u>

Plaintiffs were not damaged by the 2020 Merger. In Article 10 of the Operating Agreement, "Restrictions on Transfer," the parties negotiated the price to be paid in the event of any "occurrence resulting . . . in the succession (by operation of law or otherwise) by any other person or entity to a Member's Membership Interest." Ex. 7, Operating Agreement § 10.3(c). The agreed upon price in such an event was set by the parties as "the Book Value of the Company divided by the total number of units of the class of Membership Interest in question, as of the date of occurrence of the event." Ex. 7, Operating Agreement § 10.3(a)(ix). The uncontroverted evidence[11] is that the book value of Torch as of the 2020 Merger was $10,729,017, 10% of which was $1,072,902—that is, $281,346 <u>less</u> than what Defendants attempted to pay Plaintiffs. SOFs 45, 47. Because Plaintiffs received more money than they were entitled to (if the anti-assignment provisions applied), judgment should be entered in Defendants' favor on the claim. *See Riverside Risk Advisors*, 2022 WL 14672745 at *22 (injury is an element of breach of contract claim).

---

[11] Plaintiffs chose not to depose Defendants' damages expert, who calculated the book value of Torch. *See* Ex. 22, Yurkerwich Decl. at ¶¶ 5-6. Nor was that calculation disputed by Plaintiffs' expert. *Id.* at ¶ 7.

* * *

If the parties had intended to nullify Section 18-209(b) of the LLC Act and give Plaintiffs a contractual right to veto a merger of Torch, they would have explicitly said so in the Operating Agreement. They would not have hidden that intention—which turns Delaware LLC law on its head—in either a $50,000 spending cap or an anti-assignment clause. There is no mention of a merger veto in the Operating Agreement because the parties did not intend to include one. *See McClure*, 2018 WL 4637339 at *4 (merger lawful under LLC Act where the "Operating Agreement does not contain language that either dictates the exact voting requirements for a merger's approval or prohibits it"). Plaintiff's contract claims should not proceed to trial.

### D.   Defendants Are Entitled to Summary Judgment as to the Claimed Breach of Fiduciary Duties

The Delaware LLC Act allows members of an LLC to eliminate or limit fiduciary duties and related liabilities: "A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member [or] manager . . . ." 6 Del. C. § 18-1101(e). Where the parties to an agreement "modify, rather than eliminate, fiduciary duties," the Court may need to look at "interrelated standards in different sections of the agreement." *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 361 (Del. 2013). This is consistent with the broader principles that in "interpreting contracts," Delaware courts "construe them as a whole and give effect to every provision if it is reasonably possible," and that a "meaning inferred from a particular provision cannot control the agreement if that inference conflicts with the agreement's overall scheme." *Id.* at 360.

Plaintiffs allege that Defendants Crossed Keys and Weaver breached their fiduciary duties "by approving a merger that was self[-]interested, deceptive and unfair to plaintiffs, and by depriving plaintiffs of the fair value of their ownership interest when Torch merged with Crossed

Keys."  PTO § 4(a)(ii).  But the Torch Operating Agreement limited fiduciary duties for self-interested transactions and all but eliminated liability for breach of such fiduciary duties.  Because Plaintiffs have not developed evidence meeting the heightened requirements established by the Operating Agreement, summary judgment should be entered in favor of Defendants.

        1.      <u>The scope of applicable fiduciary duties was limited by the parties to those set out in Section 7.2 of the Operating Agreement.</u>

The members of Torch established a series of three "safe harbor provisions" in connection with potential interested-party transactions.  *See* ECF No. 51 (MTD Order) at 12.  These provisions replaced common law fiduciary duties, at least as they relate to alleged self-interested transactions (the subject of Plaintiffs' claim).  Because Plaintiff cannot prove a breach of these fiduciary duties, summary judgment should be entered.

The Delaware Supreme Court explained, in *Norton v. K-Sea Transportation Partners*, how traditional fiduciary duties are replaced by such safe harbor provisions.  67 A.3d 354, 361-62 (Del. 2013).  In *Norton*, the partners to a limited partnership agreement gave the general partner discretion to make any decision, including to enter into a merger, "so long as such action is reasonably believed by [the general partner] to be in, or not inconsistent with, the best interests of the Partnership."  *Id.* at 361.  The Supreme Court held that such contractual discretion to act in the best interests of the entity was inconsistent with the application of traditional fiduciary duties.  *Id.* at 362 ("If K-Sea GP were subject to common law fiduciary duties, it could not consent to a merger in its sole discretion.").  Accordingly, the court held that the safe harbor provision established new, contractual fiduciary duties that applied to the general partner's conduct.  *Id.*

The members of Torch likewise established several safe harbors that are inconsistent with traditional fiduciary duties, and thus the Operating Agreement "eliminates any duties that otherwise exist and replaces them with a contractual fiduciary duty" coterminous with the safe

harbors.  *Id.*  The safe harbor provisions in the Torch Operating Agreement affirmatively permit a transaction involving an affiliate of a member under any of three different scenarios.

The first safe harbor applies when a majority of disinterested members vote in favor of the transaction.  PTO § 2(a)(2)(xi) (Section 7.2(a)).  Defendants concede that this safe harbor provision does not apply here because it requires authorization "by the affirmative vote" of disinterested members.  *Id.*  Plaintiffs chose not to vote on the 2020 Merger, SOF 33, so there was no affirmative vote of the disinterested members, either against or in favor of the 2020 Merger.

The second safe harbor requires an authorizing vote of 95% of the membership interests, without regard for who is interested or disinterested.  PTO § 2(a)(2)(xi) (Section 7.2(b)).  Had Plaintiffs attended the Special Meeting of Members to vote on the merger, they could have voted against it.  But Plaintiffs chose not to vote on the 2020 Merger, one way or the other.  SOFs 32, 33.  Unlike the first safe harbor provision, the second safe harbor provision does not require an "affirmative vote" by the disinterested members to authorize the transaction.  Otherwise, the requirement for an "affirmative vote" in the prior section would be rendered "mere surplusage." *See Sunline*, 206 A.3d at 846-47 ("The contract must also be read as a whole, giving meaning to each term and avoiding an interpretation that would render any term 'mere surplusage.'").  Because Plaintiffs chose not to vote, 100% of the votes <u>that were cast</u> were in favor of the merger.  SOF 34.  Thus, the transaction could not have been in breach of the contractual fiduciary duties under the Operating Agreement.

The third safe harbor is almost identical to the one recognized in *Norton*.  Any self-interested transaction is permitted under the Operating Agreement, so long as the transaction "is fair as to the Company."  PTO § 2(a)(2)(xi) (Section 7.2(c)).  While Plaintiffs claim the merger was "unfair to plaintiffs," PTO § 4(a)(ii), they have neither alleged, nor developed evidence suggesting, that the merger was unfair as to Torch.

31

The uncontroverted evidence is that Torch benefited from the 2020 Merger, rather than being harmed by it.  WestCap agreed to invest a total of $30 million in Torch, but that agreement was predicated on the merger resulting in Mr. Weaver's affiliates owning 100% of the company. SOFs 52, 53.  The 2020 Merger thus opened the door to substantial additional capital, which Plaintiffs had refused to provide.  SOF 51.  But, in any event, the Court need not determine that Plaintiffs' continued involvement in Torch was harmful to grant this motion.  Plaintiffs must produce evidence showing the 2020 Merger was unfair as to Torch, a burden they cannot meet.

2.   Section 4.5 of the Operating Agreement eliminates Defendants' liability because there is no evidence supporting Plaintiffs' allegation that Defendants intentionally violated Plaintiffs' rights.

Even if Plaintiffs could establish a factual dispute as to whether the contractual fiduciary duties were breached, summary judgment would still be proper under Section 4.5's elimination of liability.  The parties agreed that the liability of Torch's managers would be "limited to the fullest extent permitted by the [LLC] Act."  PTO § 2(a)(2)(iii).  This included the elimination of any fiduciary duty Defendants might otherwise owe as a manager of Torch, subject to certain non-exculpated claims.  *Id.*; *see also* ECF No. 51 (MTD Order) at 15 ("Section 4.5 of the operating agreement limits a manager's personal liability for breach of fiduciary duties.").  "Where directors are contractually or otherwise exculpated from liability for certain conduct," the Delaware Supreme Court has held, the plaintiff may only proceed with "a non-exculpated claim against the directors based on particularized facts."  *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008).  Summary judgment is appropriate here because Plaintiffs have not developed any evidence demonstrating a non-exculpated fiduciary duty claim against Defendants.

As part of Section 4.5's broad limitation of liability—"to the fullest extent permitted" by law—the Parties eliminated fiduciary duties of Torch's managers, except in cases of:

- "intentional misconduct";

- "fraud";

- "knowing violation of law"; or

- in certain circumstances, "violation of applicable law as a result of the willful or grossly negligent act of omission of such Manager."

PTO § 2(a)(2)(iii).  Plaintiffs do not allege that Defendants violated any law, much less that they did so "knowingly," "willfully," or through a "grossly negligent" omission.  *See generally* PTO § 3(a) (Plaintiffs' Factual Contentions); *see also Wood*, 953 A.2d at 142 (plaintiff must identify the particular laws that were violated and prove "specific conduct" in violation of those laws, as well as defendants' knowledge "that such conduct was illegal").  Nor have Plaintiffs come forward with any facts showing fraud on the part of Defendants.  *See generally* PTO § 3(a) (Plaintiffs' Factual Contentions); *see also infra* Part III.G.

Any potential claim for breach of fiduciary duty could therefore only proceed if there were evidence of "intentional misconduct."  *See* ECF No. 51 (MTD Order) at 15 (denying motion to dismiss because "Section 4.5 does not exonerate Crossed Keys, Weaver and Cha from liability for intentional misconduct.").  The only "intentional misconduct" Plaintiffs allege was that the two independent valuations of Torch, used to determine the value of Plaintiffs' ownership interests, were "intentionally depressed," such that Defendants effected the merger "with knowledge that the valuations are, in fact, unreliable and grossly undervalued Torch's value and plaintiffs' ten percent interest." PTO at 18.  On the basis of similar allegations in the Complaint, the Court denied Defendants' motion to dismiss on this issue.  ECF No. 51 (MTD Order) at 15.  While these allegations may have been enough to survive a motion at the pleading stage, to avoid summary judgment "the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the

burden of proof." *Applied Genetics Intern., Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). Plaintiffs have failed to develop any such facts in the record of this case.

Two separate valuation firms, Objective and Cabrillo, performed appraisals of Torch in 2020 using different methodologies. SOF 39. Those separate firms arrived at very similar conclusions of the value of Torch, with valuation ranges between $5,900,000 and $7,200,000. SOFs 40, 41. Plaintiffs' own damages expert concedes that the financial forecasts Objective and Cabrillo developed to determine the value of Torch have since proven accurate. SOF 42. And those are the only two appraisals in this case. SOF 44. Plaintiffs chose not to have their expert perform his own appraisal of Torch's value. SOF 43.

Plaintiffs have developed no evidence that Defendants <u>intentionally</u> undervalued Torch in connection with the 2020 Merger. Mr. Weaver affirmed that was not his intent. SOF 38. Plaintiffs have not elicited any testimony from Mr. Weaver to the contrary, nor is there any document evidencing such an intent. At most, Plaintiffs speculate that Mr. Weaver acted with ill intent, based on nothing other than their belief that Torch was worth more than the independent appraisers concluded. But Plaintiffs must come forward with more than just evidence that Defendants got the valuation wrong. *See, e.g.*, *In re Reliance Secs. Litig.*, 135 F. Supp. 2d 480, 502, 519-20 (D. Del. 2001) (granting summary judgment on fiduciary duty claim because evidence that directors "overstated the . . . net worth" of the company was insufficient to demonstrate "intentional misconduct"). Plaintiffs have, at most, a "gut feeling" the two independent Torch valuations were intentionally undervalued; that is insufficient to survive summary judgment. *See Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir. 1989) (plaintiff could not avoid summary judgment based on lack of discriminatory intent based on his "gut feeling, from what [he] had seen and being on the staff" as to "what their intention was").

### E.     Defendants Are Entitled to Summary Judgment as to the Claimed Conspiracy to Breach Fiduciary Duties

Plaintiffs also claim, as a separate count, that Defendants Crossed Keys and Weaver conspired to breach fiduciary duties.  The elements of civil conspiracy are "(1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damages."  *In re USA Detergents, Inc.*, 418 B.R. 533, 547 (Bankr. D. Del. 2009) (applying these elements to alleged "conspiracy to breach fiduciary duties").  Summary judgment should be entered in Defendants' favor because there is no factual dispute that Plaintiffs cannot establish either of the first two elements.

### 1.     Weaver and Crossed Keys cannot conspire with each other, as a matter of Delaware law.

Plaintiffs' civil conspiracy claim fails because Defendant Crossed Keys and its agent, Defendant Weaver, cannot conspire with each other, as a matter of law:

> It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy.  A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.  Accordingly, it is entirely sensible that, as a general rule, agents of a corporation cannot conspire with one another or aid and abet each other's torts.

*Anschutz Corp. v. Brown Robin Cap., LLC*, No. CV 2019-0710-JRS, 2020 WL 3096744, at *17 (Del. Ch. June 11, 2020) (cleaned up) (emphasis added).

Plaintiffs brought this claim against only Defendants Crossed Keys, Weaver, and Cha. PTO § 4(a)(2).  Plaintiffs have since abandoned their claims against Mr. Cha.  *See infra* Part III.H. As for the remaining two defendants, Crossed Keys has only ever had two members—Brian Weaver and his wife (or trusts held in their names).  SOF 5.  Crossed Keys is managed by an entity called Prometheus Capital LLC, which is wholly owned and controlled by Mr. Weaver.  SOF 9. As Plaintiffs described in their Complaint, Mr. Weaver is the "agent in charge of Defendant

Crossed Keys." *See* ECF No. 1 (Compl.) at ¶ 10. As a matter of law, Crossed Keys could not have conspired with its agent, Mr. Weaver. *Anschutz Corp.*, 2020 WL 3096744 at *17. Plaintiffs cannot meet their burden on the first element of the conspiracy claim and summary judgment should be entered.

       2.      <u>Because there was no breach of fiduciary duty, there can be no conspiracy claim.</u>

Summary judgment is also appropriate under the second element of Plaintiffs' civil conspiracy claim, the requirement for an "unlawful act." *In re USA Detergents, Inc.*, 418 B.R. at 547 ("Delaware has maintained the requirement of an independent tort for a civil conspiracy claim."). For the reasons detailed above, Defendants did not breach the narrow fiduciary duties that survived in the Operating Agreement, and thus the conspiracy claim also fails for lack of an underlying tort. *Cf. Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*, No. 2018-0372-JTL, 2019 WL 4927053, at *8 (Del. Ch. Oct. 7, 2019) ("Once . . . the Partnership Agreement eliminated the General Partner's fiduciary duties, there was no fiduciary relationship that could support a claim for aiding and abetting a breach of fiduciary duty.").

## F.    Defendants Are Entitled to Summary Judgment as to the Unjust Enrichment Claim

Unjust enrichment is a "quasi-contractual theor[y]" of liability that permits "a recovery for the value of the benefit retained <u>when there is no contractual relationship</u> but when, on the grounds of fairness and justice, the law compels the performance of a legal and moral duty to pay." *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 866, 875 n.55 (Del. 2020) (emphasis added). "It is a well-settled principle of Delaware law that a party cannot recover under a theory of unjust enrichment if a contract governs the relationship between the contesting parties that gives rise to the unjust enrichment claim." *Well Thrive Ltd. v. Semileds Corp.*, No. 17-794, 2020 WL 7490109, at *9 (D. Del. Dec. 21, 2020).

At the Rule 12 stage, the Court sustained Defendants' motion to dismiss Plaintiffs' unjust enrichment claim, in part. Specifically, the Court dismissed the unjust enrichment claim against Defendant Crossed Keys "[b]ecause Crossed Keys signed the operating agreement and it does not dispute the existence or enforceability of the agreement." ECF No. 51 (MTD Order) at 19. But the Court declined to dismiss the claims against the other defendants because "the record reveal[ed] an issue whether the operating agreement governed plaintiffs' relationships with them." *Id.* Ultimately, the Court concluded that the "plaintiffs should be allowed to pursue alternative theories of relief at this [Rule 12] stage." *Id.*

Plaintiffs have no viable claim for unjust enrichment against the remaining defendants. They have abandoned their claims against Mr. Cha. SOF 8. And the remaining Defendants no longer dispute that the Operating Agreement governs their relationship with Plaintiffs. Summary judgment is appropriate because the underlying rationale for leaving the unjust enrichment claim in the case is no longer present. *See, e.g., In re Motor Fuel Temperature Sales Practice Litigation*, MDL No. 1840, 2013 WL 3795206, *21, n. 11 (D. Kan. July 19, 2013) (Vratil, J.) (granting summary judgment on unjust enrichment claim where prior motion to dismiss had been overruled, but as "proceedings…progressed," the parties agreed that "an express contract defines the rights of the parties").

Plaintiffs have not pursued unjust enrichment as an alternative form of relief. To the contrary, Plaintiffs' unjust enrichment and breach of contract claims have been developed in parallel and rely on the same alleged conduct: "Defendants' acts were unfair to plaintiffs in numerous respects because they deprived plaintiffs of the fair value of their ownership interests in Torch and unjustly enriched defendants, without justification and in breach of the Operating Agreement, and impoverishing plaintiffs." PTO at 20 (emphasis added). Because it is undisputed that the parties' relationship is governed by the Operating Agreement, unjust enrichment is not a viable claim.

Summary judgment is warranted.  *See J.C. Trading Ltd. v. Wal-Mart Stores, Inc.*, 947 F. Supp. 2d 449, 458 (D. Del. 2013) (granting summary judgment on unjust enrichment claim because contracts governed the relationship between the parties).

### G.   Defendants Are Entitled to Summary Judgment as to the Fraudulent Inducement Claim

The only remaining fraud-based claim is fraudulent inducement—specifically, that "Defendants fraudulently induced plaintiffs into investing in Torch while knowing that defendants would later oust them from the company."  *See* PTO n.1, § 4(a)(v).  But Plaintiffs have not developed any evidence identifying a pre-contractual misrepresentation, much less fraudulent intent arising out of a predetermined plan to "oust" plaintiffs.

Mr. Weaver was initially optimistic that Plaintiffs' involvement in Torch would be beneficial in the long term for Torch, Plaintiffs, and Crossed Keys.  SOF 12.  He had no intention at that time to enter into a merger eliminating Plaintiffs' interests in Torch.  SOF 13.  There is simply no evidence in the record that Mr. Weaver intended to "oust" Plaintiffs from the outset.

All parties acknowledged at the outset of their relationship—and in the Operating Agreement itself—that their relationship might one day conclude.  Mr. Weaver openly said as much in negotiations: "I do need to ensure rights such as being able to raise outside capital and selling the company are board decisions-------thus, we will move certain things like this into the 'Board activity' column, so the Board can do this----items like this can't require '100% member approval'.  Blocking a deal could be detrimental to the business."  SOF 20; *see also* Ex. 7, Operating Agreement §§ 4.1(b), (c), (j), & (l) (granting Mr. Weaver, as majority vote of board, right to sell Torch or all of its property and to admit new members into the company).

For their part, Plaintiffs entered into the investment recognizing it was a risky venture. SOF 14.  They had no certain plan as to whether they would remain with Torch for the entire

existence of the company.  SOF 15.  Indeed, Plaintiffs reserved the right to sell the entirety of their $750,000 stake in Torch, should new investors be admitted to the company.  *See* Ex. 7, Operating Agreement § 4.13.  The uncontroverted evidence is that Plaintiffs knew the duration of their involvement was uncertain.

Not only have Plaintiffs failed to adduce evidence in support of this claim, they failed to even allege such facts.  The PTO contains no allegations concerning Defendants' intentions prior to the execution of the Operating Agreement, much less particular facts showing that Defendants made a fraudulent misrepresentation about that intent.  *See Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) (waiver of issues not addressed in pretrial order); *cf. Cont'l Materials Corp. v. Valco, Inc.*, No. 14-CV-02510, 2019 WL 13167107, at *4 (D. Colo. Sept. 23, 2019) (granting motion in limine to exclude factual bases for fraud claim, where facts not disclosed in pretrial order).

Plaintiffs' failure to plead facts in the PTO in support of their fraudulent inducement claim was no oversight.  Magistrate Judge Schwartz informed Plaintiffs of this failure and instructed Plaintiffs that, "if Plaintiffs are still proceeding on this claim, it must be adequately supported in the factual contentions section."  SOF 58; *see also* SOFs 56, 59 (instructing Plaintiffs to "address" Defendants' contention that "there is no evidence to support Plaintiffs' contention that Defendants induced plaintiffs into investing in Torch while knowing that Defendants would later oust them from the company").  Plaintiffs failed to comply with the Court's instructions.  Defendants then reminded Plaintiffs of their obligation to provide the information requested by the Court.  SOF 60.  Plaintiffs again refused, stating without explanation that they did "not intend on adding anything else," and submitting the PTO without the required facts.  SOFs 60, 61.

The Court could not have been clearer—factual support was necessary "if Plaintiffs are still proceeding on this [fraudulent inducement] claim."  SOF 58.  No such facts were proffered,

and thus Plaintiffs should not be permitted to further proceed on this claim (or to raise new, untimely factual bases now).  Summary judgment should be entered in Defendants' favor.  *See Doerge v. Crum's Enters., Inc.*, No. 05-1019-JTM, 2007 WL 1586024, at *6 (D. Kan. May 31, 2007) (granting summary judgment where plaintiff failed to provide sufficient facts in pretrial order to plead conspiracy or fraud with particularity); *cf. Nordwald v. Brightlink Comms., LLC*, 603 F. Supp. 3d 1030, 1040 (D. Kan. 2022) (applying Rule 9(b)'s particularity requirement to allegations in pretrial order, for purposes of summary judgment on fraud claim).

### H.    Plaintiffs Have Abandoned Their Baseless Claims Against Jae Cha

Plaintiffs have failed to identify any basis for suing Mr. Cha.  Mr. Cha did not participate in any of the alleged misconduct at issue in this case.  *See* SOF 7.  Plaintiffs have finally conceded that Mr. Cha should not be a defendant and have abandoned any intention of pursuing claims against him.  SOF 8.  Judgment should therefore be entered in his favor.

## IV.    CONCLUSION

After pursuing this litigation in three courts, over 2 ½ years, Plaintiffs have failed to support a single claim with actionable facts.  Seven of their claims were dismissed at the pleadings stage. *See* PTO at 4 n.1.  Plaintiffs' claims against Mr. Cha have proven to be spurious, with Plaintiffs now admitting he should be out of the case.  Plaintiffs' wrongly asserted subject-matter jurisdiction over Torch, and both sides now agree it should be dismissed.  Plaintiffs tacitly concede they have no support for their fraud claim, even if they have inexplicably refused to drop the claim.  As for the handful of claims left against the two remaining Defendants, they fail under the plain meaning of the parties' contract and Delaware law.  Plaintiffs do not have evidence sufficient to proceed to trial on any claim.  Summary judgment should be entered in Defendants' favor.

Respectfully submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**


By: /s/ *James D. Lawrence*

James D. Lawrence         KS #22565
1200 Main Street, Suite 3800
Kansas City, MO 64105
(816) 374-3200 (telephone)
(816) 374-3300 (facsimile)
jdlawrence@bclplaw.com


**PROSKAUER ROSE LLP**

Colin G. Cabral (pro hac vice)
Shawn S. Ledingham, Jr. (pro hac vice)
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
(310) 557-2900 (telephone)
(310) 557-2193 (facsimile)
ccabral@proskauer.com
sledingham@proskauer.com

James R. Anderson (pro hac vice)
One International Place
Boston, MA 02110-2600
(617) 526-9600 (telephone)
(617) 526-9899 (facsimile)
jaanderson@proskauer.com

ATTORNEYS FOR DEFENDANTS


## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to counsel of record.


/s/ *James D. Lawrence*
Attorney for Defendants